[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-15629
_____

D.C. Docket No. 4:09-cr-00009-MCR-WCS-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JAMES L. GIBSON,

Defendant - Appellant.

_____

No. 10-15728
_____

D.C. Docket No. 4:09-cr-00001-MCR-WCS-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

SIDNEY BRIAN GIBSON,

Defendant - Appellant.

_____

No. 10-15729

_____

D.C. Docket No. 4:09-cr-00009-MCR-WCS-4

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

SIDNEY BRIAN GIBSON,

Defendant - Appellant.

_____

No. 11-10565

_____

D.C. Docket No. 4:09-cr-00009-MCR-WCS-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LEONDRAY GIBSON,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Northern District of Florida
_____

(February 14, 2013)

Before TJOFLAT, PRYOR and KRAVITCH, Circuit Judges.

PRYOR, Circuit Judge:

This appeal presents two main issues: (1) whether a defendant has standing to challenge the use of a tracking device with a global positioning system to locate a vehicle the defendant possessed when the tracking device was installed, but not when the tracking device was later used to seize incriminating evidence; and (2) whether the district court violated the Double Jeopardy Clause of the Fifth Amendment by instructing the jury that it could convict a defendant for his renewed participation in a drug conspiracy after his earlier conviction for participating in the same conspiracy. In these consolidated appeals by three brothers and codefendants, James Gibson appeals his convictions for conspiracy to possess with intent to distribute cocaine and cocaine base, 21 U.S.C. § 846, and possession with intent to distribute cocaine, 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii); Sidney Gibson also appeals his convictions for conspiracy to possess with intent to distribute cocaine and cocaine base, 21 U.S.C. § 846, and possession

3

with intent to distribute cocaine, 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii); and Leondray Gibson appeals his conviction and sentence for conspiracy to possess with intent to distribute cocaine base, 21 U.S.C. § 846. James Gibson argues that the district court erred when it refused to suppress evidence obtained through the use of a tracking device installed on a vehicle he frequently drove, but did not own, and the government argues that he lacks standing to raise that objection. Sidney Gibson argues that the district court erred by instructing the jury that it could convict him for his renewed participation in a conspiracy after his prior conviction for participating in that conspiracy and that the district court abused its discretion in admitting evidence of his prior arrest, conviction, and imprisonment. And Leondray Gibson argues that the district court abused its discretion by admitting evidence of his involvement in dog fighting and that his sentence is unreasonable. We conclude that James Gibson lacks standing to complain about the use of the tracking device to seize incriminating evidence when he was neither in possession of nor a passenger in the vehicle and that the district court protected Sidney Gibson's right to be free from being prosecuted twice for the same offense. The Gibsons' remaining arguments fail too. We affirm.

## I. BACKGROUND

4

A federal grand jury indicted James Gibson, Sidney Gibson, Leondray Gibson, and Kelvin Burton on one count of conspiracy to distribute and to possess with intent to distribute more than 5 kilograms of cocaine and more than 50 kilograms of cocaine base, commonly known as crack cocaine, between 2000 and 2009, id. §§ 841(b)(1)(A)(ii), (b)(1)(A)(iii), 846. The grand jury also indicted James Gibson, Sidney Gibson, and Burton on one count of possession with intent to distribute more than 500 grams of cocaine, 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii). The government later filed an unopposed motion to consolidate the trials of the three Gibson brothers and Burton, which the district court granted.

Our review of the procedural history is divided into ten parts. First, we address Burton's motions to suppress. Second, we address James Gibson's motion to suppress. Third, we address the pretrial proceeding about the admission of Sidney Gibson's prior conviction. Fourth, we address Leondray Gibson's pretrial objection to evidence of his participation in dog fighting. Fifth, we address Burton's plea of guilt and testimony against the Gibson brothers. Sixth, we address the trial testimony of federal prisoners about the Gibsons' cocaine trafficking. Seventh, we address the testimony of state officers and federal agents and employees. Eighth, we address the close of the evidence and James Gibson's

5

motion for a judgment of acquittal. Ninth, we address the jury instructions relevant to this appeal. Tenth, we address the guilty verdicts and the sentencing of the Gibson brothers.

### A. Burton's Motions to Suppress

Before trial, Burton filed two motions to suppress all evidence seized during a search of a Chevrolet Avalanche that he was driving on February 20, 2009. In the first motion, Burton alleged that the traffic stop during which the search occurred was an unlawful detention. In the second motion, Burton alleged that the evidence was seized as a result of the warrantless installation of a tracking device on the Avalanche. The district court later held a hearing to consider the motions, during which it heard the testimony of several witnesses.

Agent Greg Millard of the Drug Enforcement Administration testified that, before his agency decided to install the tracking device on the Avalanche, he had reason to suspect that its frequent driver, James Gibson, used the vehicle in drug trafficking. Agent Millard had seen James Gibson driving the Avalanche and had seen it parked at James Gibson's home. But Burton was the registered owner of the vehicle.

The tracking device was installed on the Avalanche without a warrant on January 27, 2009, while it was parked in the driveway of James Gibson's

6

residence.  Special Agent Grant Geyer of the Florida Department of Law Enforcement installed the tracking device to the exterior of the Avalanche.  No entry into the vehicle was necessary to install the device.  The device had no microphone or camera, transmitted only the location of the vehicle, and did not tap the vehicle's power system or interfere with its operations in any way.  When Geyer installed the device, the Avalanche was parked so that its rear end extended over the sidewalk, closer to the road than the house.  Geyer installed the device on the undercarriage of the rear end of the vehicle in roughly two to three minutes while lying on the sidewalk.

On February 18, 2009, Agent Millard received information suggesting that James Gibson would be traveling in the Avalanche.  Using the tracking device, Agent Millard located the Avalanche at an intersection in Tallahassee near a gas station and a mini-storage facility where James Gibson's girlfriend was renting a storage unit.  Agent Millard drove to the intersection, but the vehicle had already departed when he arrived.  He again used the tracking device to locate the Avalanche as it left the Tallahassee area and traveled north on Highway 59 toward Interstate 10.  Agent Millard saw the Avalanche park at a gas station at the intersection of Highway 59 and Interstate 10, where he observed an individual he believed to be James Gibson exit the vehicle.

7

From February 18 through February 20, 2009, Agents with the Drug Enforcement Administration used the tracking device to locate the Avalanche as it traveled south to Ocala, Florida, and, after a short stay, started to travel back toward Tallahassee. Agent Millard testified that this travel pattern was suspicious because Ocala was a source city for narcotics and the vehicle stayed there for only a brief period. Agent Millard informed Deputy Sheriff Doug Haskell that the Avalanche would be traveling through Madison County, that the Drug Enforcement Administration was tracking the vehicle as part of an ongoing investigation, that Agent Millard believed that James Gibson would be driving the vehicle, and that Deputy Haskell should stop and search the vehicle if he could establish probable cause.

Deputy Sheriff David Harper testified that he worked with Deputy Haskell to locate the Avalanche after Agent Millard advised Deputy Haskell that the vehicle would be traveling through their jurisdiction. Deputy Harper located the Avalanche, observed it drift out of the lane of traffic in which it had been traveling, and communicated his observations to Deputy Haskell. Deputy Harper did not stop the Avalanche because he was not in uniform.

Deputy Haskell testified that Agent Millard called him on February 20, 2009, to tell him that the Avalanche would be traveling through his jurisdiction.

8

Around 10:20 p.m., Deputy Harper reported to Deputy Haskell that he was behind the Avalanche and had observed it fail to maintain its lane of travel. Deputy Haskell intended to stop the Avalanche based on Deputy Harper's observation. As he approached the Avalanche, Deputy Haskell observed the vehicle drift out of its lane and follow too closely behind a tractor trailer. Deputy Haskell stopped the Avalanche for failure to maintain a lane and following the tractor trailer at an unsafe distance, and he identified Burton as the driver. After Deputy Haskell smelled burnt marijuana emanating from the vehicle, Burton consented to a search of the vehicle. Deputy Haskell found two kilograms of cocaine inside the vehicle.

The district court denied Burton's motions to suppress and ruled that neither the installation of the tracking device on the Avalanche nor the traffic stop violated Burton's rights under the Fourth Amendment. The district court reasoned that there is a low expectation of privacy in the location of a vehicle on a public road and that the installation of the tracking device was minimally intrusive because it did not damage the vehicle and was accomplished from a public sidewalk. The district court concluded that the installation of the tracking device and the use of the device to follow the vehicle's movements on public roads were supported by reasonable suspicion that the vehicle was involved in criminal activity.

9

## B.  *James Gibson's Motion to Suppress*

James Gibson later filed a motion to adopt Burton's motions to suppress all evidence seized based on the warrantless installation of the tracking device and a motion for reconsideration.  James Gibson stated that he had not "originally . . . file[d] a motion to suppress the evidence seized after the traffic stop of the [Avalanche] because [he] knew of no facts upon which [he] would have [had] standing to object to either the placement of the tracking device or the stop of the vehicle."  He alleged that Agent Millard's testimony that the Avalanche was in James Gibson's possession when agents installed the tracking device and that James Gibson "was seen driving the vehicle on several occasions, including right before the vehicle began moving toward Ocala" gave him standing to object to the installation of the device and to the stop and search of the Avalanche on February 20.  The government responded that James Gibson's motion should be denied for the same reasons that the district court had denied Burton's motions to suppress and that James Gibson lacked standing to contest the installation of the tracking device and the stop of the vehicle because James Gibson was neither the registered owner nor the driver of or a passenger in the vehicle when Deputy Haskell stopped and searched it.

10

The district court granted James Gibson's motion to adopt Burton's motions, but denied James Gibson's motion for reconsideration. The district court ruled that James Gibson lacked standing to contest the installation of the tracking device on the Avalanche because he had no reasonable expectation of privacy in the vehicle when the device was installed. The district court also ruled that, even if James Gibson had standing to contest the installation of the device on the Avalanche, his rights were not violated because the installation of the device was minimally intrusive and justified by reasonable suspicion that the vehicle was involved in criminal activity. The district court also ruled that James Gibson lacked standing to object to the stop of the Avalanche on February 20 because Burton was the sole occupant of the vehicle during the stop, which meant that James Gibson then had neither an ownership nor a possessory interest in the vehicle.

## C. Pretrial and Trial Proceedings About Sidney Gibson's Prior Conviction

Before trial, the government moved to admit evidence about Sidney Gibson's conviction in 2004 for conspiracy to distribute more than 500 grams of cocaine. In 2003, a police officer in Columbia County, Florida, stopped a vehicle in which Sidney Gibson was a passenger. The officer searched the vehicle and found a kilogram of cocaine hidden under the rear passenger seat. Sidney Gibson

11

had been indicted for conspiracy to distribute cocaine in excess of 500 grams in 2003. He pleaded guilty to the charge in 2004 and was sentenced to 60 months of imprisonment followed by four years of supervised release.

In its motion, the government stated that it "expect[ed] to prove that [Sidney Gibson] actively participated in the conspiracy following his release from custody" and cited United States v. Stricklin, 591 F.2d 1112, 1121 n.2 (5th Cir. 1979), for the proposition that a coconspirator's participation in a conspiracy terminates upon his arrest, and his renewed participation in the conspiracy after his arrest constitutes a new crime for double jeopardy purposes. The government argued that the evidence was admissible, under Federal Rule of Evidence 404(b), to prove Sidney Gibson's knowledge, intent, and lack of mistake in relation to the charged offenses and to rebut any argument that he did not know the seized packages on which his fingerprints were found contained cocaine. The government also argued that the evidence was relevant to prove James Gibson's participation in the cocaine distribution activities for which Sidney Gibson was convicted in 2004, which occurred during the conspiracy charged in the 2009 indictment. The government contended that evidence of Sidney Gibson's incarceration was relevant to explain Sidney Gibson's acquaintance with Omar Turral, who had been incarcerated with Sidney Gibson and whom Gary Shepard

12

would identify as a cocaine supplier to Leondray Gibson. The government also contended that the evidence was relevant to explain Sidney Gibson's lack of active participation in the conspiracy during his incarceration.

Sidney Gibson filed a motion in limine. He objected to the introduction of the evidence on the grounds that he would not present a defense of lack of knowledge of the cocaine, that his lack of active participation in the conspiracy during the period of his incarceration was irrelevant, and that the probative value of the evidence was outweighed by its prejudicial effect. Sidney Gibson failed to mention double jeopardy as a ground for suppression of the evidence.

The district court granted the government's motion in part during a conference with counsel on the first day of the trial. The district court ruled that the evidence of Sidney Gibson's incarceration and acquaintance with Turral was admissible. The district court found that evidence to be intrinsic because it was necessary to provide the jury with a full account of Sidney Gibson's participation in the charged conspiracy:

> [T]he evidence of the incarceration is relevant, and it's not extrinsic. It is purely intrinsic to the government's case in chief. It is during the time frame that is relevant in this case. Based in the charges in the indictment, 2000 through 2009, this is smack dab in the middle of that. It is intrinsic. I find also that it's necessary for the government to fully present its case to the jury, and it does complete the story of the crime for the jury from the government's standpoint. It's intrinsic.

13

The district court also found that evidence of Sidney Gibson's prior conviction was admissible to prove his knowledge and intent with respect to the charged offenses:

> [T]he actual conviction itself is not evidence of the conspiracy, it's not in furtherance of the conspiracy, and so that would be the subject of a 404(b) instruction, and it would be, I would find, relevant to the issue of knowledge and intent, and probative. Unfortunately, it's also prejudicial. But 404(b) evidence is inherently prejudicial.

During the conference, the government clarified that it also intended to introduce evidence of Sidney Gibson's arrest in 2003, which had occurred while he was transporting cocaine in a vehicle rented by James Gibson. The government argued that the conduct underlying the arrest and the drugs involved were part of the charged conspiracy and that Sidney Gibson's "continuing conduct" after his arrest in 2003 was "more in the nature of a renewal rather than a separate offense." The district court ruled that the evidence of the "drug dealing" for which Sidney Gibson was arrested in 2003 was intrinsic evidence and admissible.

Sidney Gibson objected to the admission of the evidence of his incarceration as irrelevant. He argued that the government intended to use the evidence to "explain his absence during a large part of [the] conspiracy," but that "[w]hether or not he[] [was] absent [was] not an issue in [the] case." The district

14

court reiterated that the evidence was admissible to "complete the story of [the] crime" for the jury.

Sidney Gibson also argued that his knowledge and intent were not at issue in the case. The district court stated that it thought the evidence was relevant to Sidney Gibson's knowledge of the contents of the two packages seized from the Avalanche. The government agreed and responded that Sidney Gibson would likely argue that he did not know the packages seized during the stop of the Avalanche, on which his fingerprints were found, contained cocaine. Sidney Gibson replied, "That's not the argument, Your Honor, but we'll get to that breach again, I'm sure."

During a conference with counsel on the second day of trial, the district court stated that it was concerned that the admission of evidence of Sidney Gibson's participation in the conspiracy before his conviction in 2004 could pose a problem of double jeopardy. The district court explained that the time frame of the charged conspiracy overlapped with the time frame of the conspiracy for which Sidney Gibson had been convicted in 2004. The government responded that its proposed jury instructions, which provided that the jury could find Sidney Gibson guilty of the conspiracy charge only if they determined that he had actively participated in the conspiracy after his conviction in 2004, should eliminate any

15

concern about double jeopardy.

Sidney Gibson's counsel then stated that he was "sort of ashamed of [him]self" and wondered aloud why he hadn't moved to dismiss on the basis of double jeopardy. The district court responded that counsel need not worry about forfeiting the objection:

> You know what, you are safe because I am considering it based on what has been raised. It is obviously a double jeopardy concern, and the—I'm not the judge that lets it go because the attorney—whether it's the government or the defendant —only tangentially mentioned it, or raised it. So it's framed for the Court sufficiently.

The district court stated that it intended to research the issue and invited counsel to do the same.

The district court revisited the issue of double jeopardy the following day. The district court acknowledged that the former Fifth Circuit had stated in Stricklin, 591 F.2d at 1121 n.2, that "further operation of [an] 'old' conspiracy after being charged with that crime becomes a new offense for purposes of a double jeopardy claim," but that our predecessor Circuit had later referred to its statement in Stricklin as dicta, see United States v. Delgado, 256 F.3d 264, 273 n.6 (5th Cir. 2001). The district court then stated that the facts were similar to those addressed by this Court in United States v. Benefield, 874 F.2d 1503 (11th Cir. 1989), but that Benefield was distinguishable:

16

> The facts [in Benefield] are very similar to this case in that the defendant in that case was indicted, pled guilty, convicted for a conspiracy spanning a certain period of time, and then he was subsequently prosecuted for the same conspiracy but just a broader period of time.
>
> So in other words, the initial conviction was sort of a subset of the larger overall conspiracy that he later was charged with. And the Eleventh Circuit, you know, says that violates the double jeopardy clause. But the distinction between Benefield and this case is Benefield was still serving time when he was reindicted. He never got out of prison[;] he never had a chance, so to speak, to reinvolve himself in the conspiracy.

The district court stated that both the Fourth and Seventh Circuits had ruled that a defendant's arrest terminates his participation in a conspiracy so that any continued participation following the arrest constitutes a new offense for double jeopardy purposes. See United States v. Lopez, Nos. 97-4536, 97-4601, 1998 WL 476788, at *3 (4th Cir. Aug. 11, 1998); United States v. Asher, 96 F.3d 270, 274 (7th Cir. 1996).

The government urged the district court to "submit [to the jury], under a beyond-a-reasonable-doubt standard, the issue of whether . . . Sidney Gibson participated in the conspiracy after his [2003] arrest" and to "instruct the jury that in order to find Sidney Gibson guilty of the conspiracy, they have to find that he continued to participate after the arrest date." The government argued that, even if it were dicta, the statement in Stricklin that continued participation in a conspiracy

17

after arrest constitutes a new offense for purposes of double jeopardy was "pretty good dicta . . . [and] based on the law." See 591 F.2d at 1121 n.2. The government also argued that it was "common sense" that "going to prison [was not] a defense to crimes you commit after you get out of prison."

The district court then addressed the indictment itself and asked the government whether it had a "responsibility to charge [an offense] in a way so that [it] [did not] . . . violate that double jeopardy clause." The government responded that it had a responsibility to charge [an offense] in a way which reflects the evidence," and that the evidence in the pending case suggested that the conspiracy "began on or before the year 2000 and continued through the present":

> [T]he evidence in this case is not that it was a subsequent conspiracy where nothing went on before and suddenly they picked up. This is a continuation of joint activity. And the charging decision has to do with trying to capture correctly the criminal liability of the co-defendants as well.

> But the evidence is that this conspiracy began on or before the year 2000 and continued through the present. And the fact that Mr. Gibson, Sidney Gibson, was absent for a portion of that did not interrupt the flow of the conspiracy, and when he was available again, he was doing just what he was doing before.

> And I don't think we can logically fashion a conspiracy that says that James and Leondray Gibson began conspiring in 2000, and after a date in 2003, Sidney Gibson signed back up again. I don't think there's a practical way to do that.

18

The district court then asked Sidney Gibson's counsel whether he had "anything to add to [the] discussion." Sidney Gibson's counsel responded, "No, ma'am, I sure don't. I think you got the issue right on the center." The district court did not rule on the matter, but stated its preliminary conclusion that it would allow the issue to go to the jury based on precedent that a coconspirator's arrest terminates his participation in a conspiracy and that any acts committed after his arrest to renew his participation in the conspiracy constitute a separate crime for double jeopardy purposes.

After the jury had been excused for the day, the district court announced that it would admit evidence of Sidney Gibson's participation in the conspiracy before his conviction in 2004 and provide limiting instructions to the jury to avoid a violation of Sidney Gibson's right to be free from double jeopardy:

> I am going to allow the evidence in. I am going to instruct the jury that they cannot consider any evidence on Count 1 against Mr. Gibson that predates the date of his conviction. . . .
>
>     . . . .
>
> So it would include any of the circumstances surrounding the arrest that form the basis of the conviction, as well as the conviction, they would not be able to consider on Count 1, and in order [to] find Mr. Gibson guilty on Count 1, the jury is going to have to conclude that the government has established beyond a reasonable doubt all of the elements necessary for a conviction on Count 1 based on evidence after that date.

19

. . . .

As to Count 2, I am going to give the 404(b) instruction that the evidence of the arrest and the conviction can be considered on the issue of knowledge and intent on Count 2 only, but not in deciding whether he committed the acts charged in the indictment, which usually gives me 14 glazed eyes. But in any event, we do the best we can with that 404(b).

Sidney Gibson offered no objection.

### D. Leondray Gibson's Objection to Evidence of Dog Fighting

During a conference with counsel on the second day of trial, Leondray Gibson objected to the admission of proposed testimony concerning his involvement in dog fighting. Leondray Gibson argued that evidence of his involvement in dog fighting would be more prejudicial than probative to the charges pending against him. The district court observed that the evidence was potentially relevant to explain how Leondray Gibson had become acquainted with some of the witnesses and to establish that he earned a substantial income not attributable to any legitimate source. The district court stated that it would probably admit the evidence with a limiting instruction to the jury, but would not rule on the issue until later that day.

### E. Burton's Guilty Plea and Trial Testimony

Burton pleaded guilty and testified at trial against the Gibsons. Burton testified that he had known James, Sidney, and Leondray Gibson since they

20

attended high school together in Ocala. Burton moved from Ocala to Tallahassee in either late 2006 or early 2007 to open an automobile detailing business with James Gibson. When Burton first arrived in Tallahassee, he lived in an apartment where Gary Shepard was also residing and James Gibson visited occasionally. One day, Burton saw Shepard enter the apartment with an overnight bag containing multiple kilograms of cocaine. Burton testified that Shepard and James Gibson argued about how the cocaine should be distributed between the two of them.

In 2007, Burton began transporting cocaine from Ocala to Tallahassee for James Gibson. Ordinarily James Gibson would procure the cocaine to be transported in Ocala, and Burton would retrieve the cocaine from James and transport it to Tallahassee. At the apartment in Tallahassee, James would weigh the cocaine and call distributors to come and pick it up. Burton and James leased the apartment in Burton's name to improve Burton's credit, but James paid the monthly rent. Once, in 2008, Burton picked up the cocaine from Leondray Gibson in Ocala before transporting it to Tallahassee. When Burton arrived in Tallahassee with the cocaine, James was upset because there was not as much cocaine as he thought there should have been.

Burton also witnessed James Gibson sell cocaine to two brothers, "Relle"

21

and "Robert." After Relle was later arrested, Burton and James leased a new apartment for the storage and distribution of cocaine because Relle knew the location of the first apartment. Burton signed the lease for the new apartment, but James paid the deposit and the monthly rent. James and Burton also acquired a Chevy Avalanche, which James intended to use in his automobile upholstery and detailing business. James paid for the vehicle and its insurance, but they registered the vehicle in Burton's name.

When asked to describe the events that led to his arrest on February 20, 2009, Burton testified that James Gibson had instructed him to go to Fort Lauderdale, Florida, with Sidney Gibson to retrieve something. Burton and Sidney arrived in Fort Lauderdale at 3:47 a.m. on February 20 and rented a hotel room in Burton's name. Burton explained that Sidney could not rent the room in his name because he was not allowed to leave the Tallahassee area while on probation. Later that day, Burton and Sidney went to a warehouse and retrieved two kilograms of cocaine from a man whom Sidney had met in prison. Sidney packaged the cocaine and put it in a speaker box in the back of the Avalanche. Sidney and Burton drove to Ocala, where they met James Gibson. Then James, Sidney, and Burton drove from Ocala toward Tallahassee in separate vehicles, with Burton driving the Avalanche. The three of them communicated using their

22

cell phones during the drive.  After they reached Interstate 10, Sidney and James sped up and left Burton.  Burton explained that he did not want to speed while transporting the cocaine.  Despite his caution, Burton was stopped by a deputy who found the cocaine hidden in the speaker box and arrested him.

*F.  Trial Testimony of Federal Prisoners*

Willie Douglas, a federal prisoner serving a sentence for cocaine trafficking who had grown up with the Gibsons in Ocala, testified that he and Leondray Gibson were partners in a record company in which Leondray had invested $70,000 of "drug money," but the record company never generated any substantial profits.  Douglas entered the drug business when he was 15 or 16 years old by selling cocaine base he had obtained from James Gibson.  Later, Douglas and Leondray became partners in the sale of cocaine and cocaine base.  Sometime after 2003, Leondray began acquiring cocaine from a Mexican supplier in Volusia County, Florida, about 50 minutes from Ocala.  Douglas testified that Leondray supplied both James and Sidney Gibson with cocaine on multiple occasions.  Eventually, Leondray's Mexican supplier in Volusia County was arrested, and Leondray began purchasing cocaine directly from sources in Mexico.

Douglas and Leondray were also partners in a dog fighting operation.  They had about 70 dogs between them and had purchased some of those dogs for $2,000

23

or $2,500 each.  Douglas and Leondray used to "match" their dogs against Robert Henry Glanton's dogs.  After Douglas testified about dog fighting, the judge instructed the jury, "[L]et me remind you that the defendants in this case are not on trial for dog fighting.  There's no dog fighting charges in the indictment in this case."

Gary Shepard, another federal prisoner serving a sentence for cocaine trafficking, testified that he met Leondray Gibson in 1998 when both were students at Florida A&M University and that he and Leondray became partners in cocaine trafficking and distribution.  Shepard and Leondray obtained cocaine in large quantities from suppliers and sold it in smaller quantities to customers.  Shepard identified Omar Turral as one of their cocaine suppliers.  Sidney Gibson and the government later stipulated that Sidney and Turral were incarcerated at the same institution from January 8, 2007, to April 15, 2008.  Leondray introduced Shepard to James and Sidney Gibson, whom Leondray made clear were also involved in the drug business.  Shepard saw Sidney engage in drug transactions.  Shepard also transported cocaine from Ocala to Tallahassee for James once or twice.

Robert Sherelle Glanton, a federal prisoner serving a sentence for conspiracy to distribute cocaine, testified that he goes by the name "Relle" and

24

that he and his brother, Robert Henry Glanton, began purchasing cocaine from James Gibson in 2007. Relle continued to purchase cocaine from James until Relle was arrested in August 2008. Relle recalled that James once stated that he had lost $60,000 three weeks in a row betting on dog fights. Relle too had bet money on dog fights.

Leondray Gibson then moved for the exclusion of further testimony regarding his participation in dog fighting. The prosecutor responded that further testimony would establish a link between Leondray's dog fighting and drug dealing because Robert Henry Glanton would testify that Leondray had offered to give him better prices for drugs if he would agree to "condition" Leondray's dogs. The prosecutor also argued that the testimony would provide context for the drug trafficking operation because many of the participants in that operation had become acquainted with one another through dog fighting. The district court ruled that it would allow Robert Henry Glanton to testify about Leondray's involvement in dog fighting, but that it would not allow detailed testimony about how the dogs were handled, trained, or fought. The district court stated that it would issue another limiting instruction to the jury.

Robert Henry Glanton, a federal prisoner serving a sentence for conspiracy to distribute cocaine and cocaine base, testified that he had known Leondray

25

Gibson since 2002.  Robert met James Gibson in 2007 at a dog fight in which

Leondray was involved and that he and his brother, Relle, had first purchased

cocaine from James in late 2007.  Robert also attempted to purchase cocaine from

Leondray by telephone on several occasions, but was unsuccessful.  Robert knew

Leondray well enough to recognize his voice over the telephone because the two

had previously discussed dog fights by telephone.  At the conclusion of Robert's

testimony, the district court gave the jury the following limiting instruction about

the evidence of dog fighting:

> [L]et me remind you again, that there are no charges of dog fighting in
> this case.  And also, the fact that Leondray Gibson may have been
> involved in the dog fighting business does not mean that he committed
> the offense that he's been charged with in this case.

### G.  Trial Testimony of Officers and Agents

The government also presented testimony from several state officers and

federal agents and employees.  Deputy Haskell testified that, on February 20,

2009, he stopped a Chevy Avalanche traveling west on Interstate 10 for failure to

maintain a lane and following too closely.  He stated that Burton, the driver, was

the only occupant of the vehicle and that Burton consented to a search of the

vehicle.  Deputy Haskell discovered two kilograms of cocaine hidden in a speaker

box in the rear of the vehicle.  He then arrested Burton for cocaine trafficking and

seized a cellular telephone that Burton had in his possession.  Deputy Haskell gave

the cocaine, the cellular telephone, and the Avalanche and its contents to Agent

Millard.

Agent Millard testified that he received evidence from Deputy Haskell and

other officers of the Sheriff's Department and personally removed additional items

from the Avalanche on the night of Burton's arrest.  Agent Millard testified that

Burton's cellular telephone was ringing and receiving text messages when it was

given to him, and that the call and the text messages were from telephone numbers

recorded in the contact list of the telephone as "J" and "Cid."  Agent Millard also

testified that he looked through several text messages stored on the telephone.

The district court admitted four of those text messages into evidence.  One

of the stored messages had been sent from Burton's phone to "J" on James

Gibson's fortieth birthday and read, "Happy b day you the big 40 today.°.°.°."

Another message, which had been sent to Burton's phone from "Cid" at 9:49 p.m.

on February 19, 2009, read "Lump, call back, very important jg need you dis

peppa his phone dead!"  Agent Millard testified that "Lump" was a nickname for

Burton, "J.G." was a known nickname for James Gibson, and "Peppa" referred to

Sidney Gibson.  A third message, sent to Burton's phone from "J" on February 18,

2009, read, "[C]hill out,im [sic] in route!"  The final message, which was sent

27

from Burton's phone to "J" about four hours before Burton's arrest on February 20, 2009, read, "75 20 miles."

Also included among the evidence seized from the Chevy Avalanche after Burton's arrest was a receipt from Interstate Batteries dated February 17, 2009. Agent Millard testified that he believed the signature on the receipt matched James Gibson's signature. Agent Millard also testified that he had seen the Chevy Avalanche on February 18, 2009, as it left Tallahassee and traveled north on Highway 59 toward Interstate 10. He observed the vehicle park at a gas station near the intersection of Highway 59 toward Interstate 10, and he saw a man leave the vehicle. He believed that the man was James Gibson.

Agent Millard also took possession of the two packages of cocaine seized from the Avalanche the night of Burton's arrest. Agent Millard sent the packages to the laboratory of the Drug Enforcement Administration in Miami for testing. Jeanette Perr, a forensic chemist with the Drug Enforcement Administration, testified that she performed several tests on the contents of the two packages and that the results of those tests established that the packages contained cocaine. Elizabeth Foster, a fingerprint specialist with the Drug Enforcement Administration, testified that she identified Sidney Gibson's fingerprints on both packages of cocaine.

28

The government also called witnesses to testify about Sidney Gibson's prior arrest and conviction for conspiracy to distribute cocaine. James Finnell, who had been a police officer with the Lake City Police Department in 2003, testified that he stopped a vehicle in which Sidney Gibson was a passenger on February 11 of that year. During a search of the vehicle, Finnell discovered a kilogram of cocaine. Scott MacKinlay, a United States Probation Officer, testified that he supervised Sidney Gibson after his release from prison. MacKinley testified that Sidney Gibson had been convicted of conspiracy to distribute more than 500 grams of cocaine in 2004 and sentenced to five years' imprisonment followed by four years of supervised release. MacKinley also testified that Sidney Gibson had been placed on supervised release on August 29, 2008.

Immediately after MacKinlay's testimony, the district court instructed the jury as follows about Sidney Gibson's earlier arrest and conviction and the burden of the government to prove beyond a reasonable doubt that Sidney Gibson later participated in the conspiracy again:

> From the testimony of the last two witnesses, you've heard evidence that Sidney Gibson was convicted in 2004 for conspiracy to distribute cocaine based on an arrest that occurred in 2003.
>
> The government alleges that this was part of the same conspiracy that's been charged in this case. Under the law, a defendant may not be prosecuted a second time for the same offense, including the offense of

29

conspiracy.

Once a defendant is arrested for conspiracy, his participation in that conspiracy terminates. In other words, the government may not prosecute Sidney Gibson again for any conduct in connection with that earlier arrest and conviction.

However, a defendant who actively participates in a conspiracy after his arrest commits a new crime for which he may be prosecuted.

Accordingly, Sidney Gibson cannot be held accountable on Count 1 . . . for any conduct in connection with his arrest in 2003 or his subsequent conviction. And the only conduct, if any, for which he may be held accountable on Count 1 is that which occurred after 2004. . . .

So to find Sidney Gibson guilty of the conspiracy charged in Count 1, you must unanimously agree that the government has proved beyond a reasonable doubt each of the elements of conspiracy, as I'll instruct you on at the conclusion of the trial, based on evidence that occurred after 2004. In other words, Mr. Gibson cannot be guilty of Count 1, unless you find beyond a reasonable doubt that he actively participated in the conspiracy after 2004.

The government . . . must prove all of the elements of the crimes that are charged in the indictment beyond a reasonable doubt. The fact that a defendant has previously been convicted of a criminal offense does not mean that the defendant committed a criminal offense in this case or that the government has proved all of the elements of the alleged offenses that have been charged in this case.

As I said just now, and explained to you, Sidney Gibson's prior conviction, the conduct that formed the basis for that conviction, cannot be considered by you for any purpose in deciding the conspiracy charge against him in Count 1.

You also may not consider that evidence of the conviction in deciding if Sidney Gibson committed any of the acts charged in Count

2.

You may, however, consider this evidence, the conviction from 2004, for very limited purpose, which I'm going to explain to you now. You are instructed that if you first find beyond a reasonable doubt from other evidence in this case, evidence other than that occurring in 2003 and [2004], that he did in fact commit the acts charged in Count 2 of the indictment, then you may—but you're not required to—consider the evidence of Mr. Gibson's arrest and prior conviction in determining whether he had the requisite knowledge and intent to commit the crime charged in Count 2 of the indictment.

## H.  The Close of Evidence and James Gibson's Motion for a Judgment of Acquittal

After the government rested, James Gibson presented the testimony of four witnesses, and Leondray Gibson presented the testimony of one witness.  Sidney Gibson did not present any witnesses to testify in his defense.

After the three Gibson brothers rested, James Gibson moved for a judgment of acquittal as to count two on the ground that the government had failed to prove that James Gibson participated in acquiring the two kilograms of cocaine seized on February 20, 2009.  The district court denied the motion.  Neither Sidney Gibson nor Leondray Gibson moved for a judgment of acquittal.

## I.  Jury Instructions

The district court held an attorney conference to review the proposed jury instructions.  When the district court reviewed its proposed instructions relating to "the double jeopardy issue," it asked Sidney Gibson's counsel whether he had any

31

comments.  Sidney Gibson's counsel responded, "I've read it and reread it, and I've—I actually like it, Judge. I think it's well written. I think it applies."  When the district court reviewed its proposed instructions relating to evidence of "similar acts" admitted under Rule 404(b), it again asked Sidney Gibson's counsel whether he had any comments.  Sidney Gibson's counsel replied, "No, Your Honor."

In its charge to the jury, the district court repeatedly instructed the jurors that it was the responsibility of the government to prove beyond a reasonable doubt the facts necessary for the jury to find each of the defendants guilty of the offenses charged in the indictment.  The district court also instructed the jury that it could consider only the evidence in reaching its verdict and that "the evidence" meant "the testimony of the witnesses and the exhibits that were admitted in the record."  The district court explained that, in reaching its verdict, the jury must disregard anything the district court may have said other than its instructions on the law.

The district court instructed the jury that it could not consider any evidence of Sidney Gibson's participation in the conspiracy before his conviction in 2004 in deciding whether Sidney Gibson was guilty of the conspiracy charge:

During the course of the trial, you've heard evidence that Sidney Gibson

32

was convicted in 2004 for conspiracy to distribute cocaine based on an arrest that occurred on February 11th, 2003.

At that time a vehicle in which he was a passenger was stopped, searched and found to contain one kilogram of cocaine. The government alleges that this was part of the same conspiracy charged in this case.

Under the law, a defendant may not be prosecuted a second time for the same offense, including the offense of conspiracy. Once a defendant is arrested for conspiracy, his participation in that conspiracy terminates. In other words, the government may not prosecute Sidney Gibson again for any conduct in connection with that earlier arrest and conviction. However, a defendant who actively participates in a conspiracy after his arrest commits a new crime for which he may be prosecuted.

Accordingly, Sidney Gibson cannot be held accountable on Count 1 for any conduct in connection with his arrest in 2003 or his subsequent conviction. And the only conduct, if any, for which he may be held accountable on Count 1 is that which occurred after 2004. To find Sidney Gibson guilty of the conspiracy charged in Count 1, you must unanimously agree that the government has proved beyond a reasonable doubt each of the elements of conspiracy, as previously outlined, based on evidence occurring after 2004. In other words, Sidney Gibson cannot be guilty of the conspiracy in Count 1 unless you find beyond a reasonable doubt that he actively participated in the conspiracy after 2004.

The district court also instructed the jury as follows that it could consider Sidney Gibson's conviction in 2004 only in determining whether he later had knowledge of his possession of cocaine and the intent to distribute cocaine:

As I explained to you a moment ago, you cannot consider evidence of Sidney Gibson's prior conviction or the conduct forming the

33

basis of that conviction for any purpose in deciding the conspiracy charge in Count 1 of the indictment against Sidney Gibson. You also may not consider evidence of Sidney Gibson's prior conviction in deciding if Sidney Gibson committed any of the acts charged in Count 2 of the indictment. You may consider the evidence for other very limited purposes with regard to Count 2, and only Count 2, as I will now explain.

You are instructed that if you first find beyond a reasonable doubt from other evidence in this case that Sidney Gibson committed the acts charged in Count 2 of the indictment, then you may, but are not required, to consider the evidence of Mr. Gibson's arrest and prior conviction in determining whether he had the requisite knowledge and intent to commit the crime charged in Count 2 of the indictment. I remind you again, however, that you may not consider evidence of Sidney Gibson's arrest and prior conviction for any purpose in deciding Count 1 against him.

After its charge to the jury, the district court asked James, Sidney, and Leondray Gibson whether they had "any objections to the instructions as given." James, Sidney, and Leondray Gibson each replied that they had no objections. The jury then deliberated.

### J.  Guilty Verdicts and Sentencing

The jury found James Gibson guilty on both counts, it found Sidney Gibson guilty on both counts, and it found Leondray Gibson on count one.

The district court sentenced James Gibson to life imprisonment as to count one and 360 months of imprisonment as to count two, to run concurrently. The district court found that Sidney Gibson had violated the conditions of his

34

supervised release and revoked his supervised release.  It sentenced Sidney Gibson

to 120 months of imprisonment as to each of counts one and two, to run

concurrently, and 36 months of imprisonment for violating the conditions of his

supervised release, to run consecutively to his sentences for counts one and two.

At the sentencing hearing for Leondray Gibson, his counsel argued that he

was "a man of gentle spirit, not a violent person. . . . certainly not a violent

offender of any sort."  The government responded by reciting the facts underlying

prior convictions he had received for aggravated assault, armed trespass, and

robbery and by describing the violence inherent in dog fighting.  The government

also argued that distribution of cocaine was itself a violent crime:

> When you put that much poison on the street, we can only
> speculate how many people died as a result of it, how many lives were
> ruined, how many burglaries and acts of prostitution and other crimes
> were committed so that the pathetic end user could buy Mr. Gibson's
> product. That is not a nonviolent crime.
>
> The defendant regularly and routinely armed himself. That is not
> a nonviolent crime.

After both parties had presented their arguents, the district court stated that

the quantity of drugs in question was twice the amount that would support a life

sentence under the guidelines, and any lesser sentence would result in an

unwarranted sentencing disparity, as it had given life sentences in other cases with

35

similar defendants.  The district court stated that a harsh sentence was necessary to promote respect for the law and to deter Gibson, whom the district court found to have no remorse for his crimes, from committing similar crimes in the future.  The district court also stated that the Gibsons' lucrative conspiracy ruined the lives of many people:

> We heard a lot today about Leondray, and for good reason, it's his sentencing.  But what's noticeably absent from a hearing of this nature on a crime and a crime of this nature, is the testimony or evidence of all of the lives ruined as a result of the amount of drugs that was funneled out into the community, both in this district as well as in the Middle District of Florida, as a result of this very lengthy, very lucrative—very lucrative conspiracy.

The district court found the presentence investigation report to be accurate.  That report provided that Leondray Gibson's total offense level was 44, his criminal history category was IV, and the only recommended sentence for him under the sentencing guidelines was life imprisonment.

The district court sentenced Leondray Gibson to life imprisonment. Leondray Gibson's counsel objected to the reasonableness of the sentence on the ground that the district court had speculated about lives ruined by Leondray Gibson's conduct.  The district court responded that its earlier comment related to the nature of the offense, but did not affect the sentence:

> [A]s to the objection regarding my comment as to lives ruined, that was

36

in response to [Leondray's counsel's] argument . . . about the nature of this offense. And I would simply take judicial notice that drug dealing is a serious and dangerous offense, particularly when there are weapons involved. But my sentence would be the exact same if I didn't consider anything with regards to lives being destroyed.

## II.  STANDARDS OF REVIEW

Several standards govern our review of this appeal.  "In reviewing a district court's denial of a motion to suppress, we review its findings of fact for clear error and its application of law to those facts de novo.  United States v. Ramirez, 476 F.3d 1231, 1235 (11th Cir. 2007).  "Further, when considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the party prevailing in the district court—in this case, the government."  Id. at 1235–36.  "[A] district court's double jeopardy ruling is subject to de novo review . . . ."  Benefield, 874 F.2d at 1505.  A federal constitutional error is harmless if a court is convinced "beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained."  Yates v. Evatt, 500 U.S. 391, 402–03, 111 S. Ct. 1884, 1892 (1991) (quoting Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967)), rev'd on other grounds, Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475, (1991).

"We review the district court's ruling on admission of evidence for abuse of discretion."  United States v. Jiminez, 224 F.3d 1243, 1249 (11th Cir. 2000). "An

37

abuse of discretion occurs if the district court applies an incorrect legal standard or makes findings of fact that are clearly erroneous." United States v. Wilk, 572 F.3d 1229, 1234 (11th Cir. 2009). "Even where an abuse of discretion is shown, nonconstitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected." United States v. Sellers, 906 F.2d 597, 601 (11th Cir. 1990). "In reviewing issues under [Federal Rule of Evidence] 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." United States v. Tinoco, 304 F.3d 1088, 1120 (11th Cir. 2002) (internal quotation marks omitted).

We review jury instructions challenged in the district court "de novo to determine whether the instructions misstated the law or misled the jury to the prejudice of the objecting party." United States v. Felts, 579 F.3d 1341, 1342 (11th Cir. 2009). "In contrast, jury instructions that are challenged for the first time on appeal are reviewed for plain error." Id. at 1343. Where a party expressly accepts a jury instruction, "such action constitutes invited error" and "serve[s] to waive [his] right to challenge the accepted instruction on appeal." United States v. Silvestri, 409 F.3d 1311, 1337 (11th Cir. 2005). We will not reverse a defendant's conviction based on a challenge to the jury charge unless we are "left with a

38

substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." Felts, 579 F.3d at 1343; United States v. Dohan, 508 F.3d 989, 993 (11th Cir. 2007). "When the jury instructions, taken together, accurately express the law applicable to the case without confusing or prejudicing the jury, there is no reason for reversal even though isolated clauses may, in fact, be confusing, technically imperfect, or otherwise subject to criticism." United States v. Beasley, 72 F.3d 1518, 1525 (11th Cir. 1996).

"We review sentences for procedural and substantive reasonableness under an abuse of discretion standard," United States v. Wetherald, 636 F.3d 1315, 1320 (11th Cir. 2011), "consider[ing] the totality of the facts and circumstances," United States v. Irey, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc). We will "vacate the sentence if, but only if, we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors" and "arriv[ed] at a sentence that l[ay] outside the range of reasonable sentences dictated by the facts of the case." Id. at 1190 (discussing 18 U.S.C. § 3553(a)) (internal quotation marks omitted).

## IV. DISCUSSION

We divide our discussion of this consolidated appeal into three parts. First, we address James Gibson's argument that the district court should have

39

suppressed the evidence obtained as a result of the installation of the tracking device on the Avalanche. Second, we address Sidney Gibson's arguments about double jeopardy and whether the district court abused its discretion when it admitted evidence of his prior conviction. Third, we address Leondray Gibson's arguments that the district court abused its discretion when it admitted evidence of his participation in dog fighting and that his sentence is unreasonable.

### A. James Gibson's Arguments for Suppression of the Evidence Gained From the Tracking Device Fail.

James Gibson argues that all evidence obtained from the tracking device on the Avalanche should have been suppressed because the installation and use of the tracking device constituted a "search" without a warrant that violated the Fourth Amendment. He maintains that he has standing to challenge the search because he had a "subjective and objective expectation of privacy" in the Avalanche. Specifically, he argues that this expectation of privacy was evidenced by his possession and control of the Avalanche when the tracking device was installed, Agent Millard's observation of him driving the Avalanche, and Agent Millard's testimony that "the purpose for having the tracking device installed on the . . . Avalanche" was his belief that "James Gibson was involved in drug trafficking." James Gibson relies on United States v. Miller, 821 F.2d 546, 548 (11th Cir.

1987), for the proposition that the driver of a borrowed vehicle has standing to challenge a search of that vehicle.

The government challenges James Gibson's standing to object to the use of the tracking device, and, in the alternative, the government argues that the evidence obtained from the tracking device was admissible under the good faith exception to the exclusionary rule because agents attached the device to the Avalanche in reliance on binding Circuit precedent, see United States v. Michael, 645 F.2d 252, 255–57 (5th Cir. May 11, 1981) (en banc).  In support of its alternative argument, the government cites Davis v. United States, --- U.S. ---, 131 S. Ct. 2419, 2434 (2011), where the Supreme Court held that "when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply."

The Supreme Court held in United States v. Jones, --- U.S. ---, 132 S. Ct. 945, 949 (2012), that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search[]'" within the meaning of the Fourth Amendment.  The Court expressly declined to consider whether the use of the device, without a warrant, to track a vehicle's movements is valid under the Fourth Amendment if supported by probable cause or reasonable suspicion, id. at 954, and the government raises no

41

such argument here.  The Court also expressly declined to consider whether Jones had standing to challenge the installation of the device on the car for which he was "the exclusive driver," but that was registered in his wife's name.  Id. at 949 n.2.

A defendant has standing to challenge a warrantless search if the defendant had a "legitimate expectation of privacy" in the property when it was searched.  See Rakas v. Illinois, 439 U.S. 128, 143, 99 S. Ct. 421, 430 (1978).  The defendant need not own the property, id., but his expectation of privacy must be "reasonable," which means that it "has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."  Minnesota v. Carter, 525 U.S. 83, 88, 119 S. Ct. 469, 472 (1998) (internal quotation marks omitted).  James Gibson was not the owner of the Avalanche, see Fla. Stat. §§ 316.003(26), 322.01(31), but he paid for the insurance and maintenance of the Avalanche and often drove it.  We have held that an individual who borrows a vehicle with the owner's consent has a legitimate expectation of privacy in the vehicle and standing to challenge its search while it is in his possession.  Miller, 821 F.2d at 548 & n.2.

The decision of the Fifth Circuit in United States v. Hernandez, 647 F.3d 216, 219–20 (5th Cir. 2011), is instructive on the issue of standing.  In Hernandez,

42

an agent with the Drug Enforcement Administration attached a tracking device with a global positioning system to a truck owned by Angel Hernandez while the vehicle was parked on a public street in front of Angel's residence.  Id. at 218. Two days later, agents used the tracking device to locate the vehicle and observed Angel's brother, Jose Hernandez, load several packages onto the truck.  Id.  The agents alerted local patrol officers who then stopped Jose for a traffic violation, obtained consent to search the truck, and discovered illegal narcotics hidden in the packages Jose had loaded onto the vehicle.  Id.  The Fifth Circuit concluded that Jose lacked standing to challenge the installation of the tracking device on his brother's truck, in part because he had no possessory interest in the vehicle when the device was installed.  Id. at 219.  But the Fifth Circuit concluded that Jose, as a borrower, had standing to challenge the use of the tracking device to locate the truck on the day of the search because, "where a person has borrowed an automobile from another, with the other's consent, the borrower becomes a lawful possessor of the vehicle and thus has standing to challenge its search."  Id. (quoting United States v. Lee, 898 F.2d 1034, 1038 (5th Cir. 1990)).  James Gibson's position is the opposite of Jose Hernandez's position: that is, James Gibson was a borrower of the vehicle when the tracking device was installed, but not when the vehicle was searched and drugs were found on February 20.

43

We conclude that James Gibson has standing to challenge the installation and use of the tracking device while the vehicle was in his possession, but not the use of the tracking device to locate the Avalanche when it was moving on public roads and he was neither the driver nor a passenger. James Gibson had no possessory interest in the Avalanche on February 20, 2009, and he lacks standing to challenge the seizure and search of the vehicle that evening.

The dissent would conclude that James Gibson had standing to challenge the search on February 20, 2009, because he was effectively a co-owner of the Avalanche, but that argument is not supported by our precedents. The dissent relies on our decision in United States v. Chaves, 169 F.3d 687 (11th Cir. 1999), for its conclusion that James Gibson had standing to challenge the search, but that decision held only that a defendant who has exclusive custody and control of a piece of property has standing to challenge the search of that property when he is not present, see id. at 690–91, which is a standard that James Gibson cannot meet. In Chaves, the defendant established exclusive custody and control of a warehouse he neither owned nor formally rented because he possessed "the only key" and he kept personal and business papers in the warehouse. Id. James Gibson did not establish that he had exclusive custody and control of the Avalanche. He presented no evidence that he had the only key to the Avalanche. And neither

44

Burton's testimony that he did not "get to have the use of the Avalanche to drive anytime anywhere [he] wanted to," nor the Agents' testimony that James Gibson frequently drove the Avalanche affirmatively established that James Gibson had the power to exclude all others from the vehicle. Agent Millard's testimony that the officers found papers in the Avalanche that belonged to Burton, Sidney Gibson, Leondray Gibson, and James Gibson also undermines any argument that James Gibson had exclusive custody and control of the vehicle sufficient to confer standing to challenge the search of the vehicle on February 20, 2009.

The dissent also suggests that our decisions in United States v. Sarda-Villa, 760 F.2d 1232 (11th Cir. 1985), and in United States v. Garcia, 741 F.2d 363 (11th Cir. 1984), support James Gibson's claim to standing, but we did not conclude that the defendants in either of those cases had standing. In Sarda-Villa, we recognized that the ability to exclude others from property is an important factor in the standing analysis, but concluded that a defendant's bald assertion that he could exclude others from a boat on which he was a crewman was insufficient to confer standing to challenge the search of that boat. 760 F.2d at 1236. In Garcia, we concluded that a defendant who was in control of an apartment on the day of his arrest could not object to the search of that apartment because he used it by appointment only and stored no personal belongings there, 741 F.2d at 366. James

45

Gibson offers even less evidence than the defendants in those cases that he had exclusive custody and control of the Avalanche. He never asserted that he had exclusive custody and control during trial, see Sarda-Villa, 760 F.2d at 1236, nor did he possess custody and control of the Avalanche when it was searched on February 20, 2009, see Garcia, 741 F.2d at 366. Like the defendants in those cases, James Gibson has failed to meet his burden to establish that he had exclusive custody and control of the Avalanche.

Contrary to the assertion of the dissent, we do not hold that only the person with legal ownership has a reasonable expectation of privacy at the time a tracking device is installed on a vehicle. If we had so held, we could not have concluded, as we do, that James Gibson has standing to challenge the installation of the tracking device on the Avalanche when it was in his possession and control. Instead, we conclude that James Gibson has not established that he had a reasonable expectation of privacy in the Avalanche only when it was searched on February 20, 2009, because he was not the legal owner of the Avalanche, he has not established that he had exclusive custody and control of the Avalanche, and he was neither a driver of, nor a passenger in, the Avalanche when it was searched.

The dissent also suggests that our decision will create problems for police investigating drug activity because the police will need to conduct a title search

46

when they apply for a warrant to install a tracking device on a vehicle, but that argument fails. To obtain a warrant, police must establish probable cause to conclude that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983). Although an affidavit "should establish a connection between the defendant and the [property] to be searched and a link between the [property] and any criminal activity," United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002), the Fourth Amendment does not bar the issuance of a warrant to search a third party's property if police can establish probable cause.

James Gibson has standing to challenge Agent Millard's testimony that, on February 18, 2009, he saw a man he believed to be James Gibson driving the Avalanche out of Tallahassee toward Interstate 10, but any error in admitting that evidence was harmless. Although Agent Millard used the tracking device to locate the Avalanche that day, his testimony about that event was not incriminating. Agent Millard's testimony about the route taken by the vehicle on February 18 established nothing more than that James Gibson drove the vehicle to a convenience store near the intersection of a state road and an interstate highway. We are convinced "beyond a reasonable doubt" that Agent Millard's testimony about that trip "did not contribute to the verdict obtained." See Chapman, 386

47

U.S. at 24, 87 S. Ct. at 828.

### B. *Sidney Gibson's Arguments About Double Jeopardy and the Admission of His Prior Conviction Fail.*

Sidney Gibson raises two arguments. He contends that the district court, in its jury instructions, violated his right to be free from double jeopardy. He also contends that the district court abused its discretion in admitting evidence of his conviction in 2004. Both arguments fail.

### 1. The District Court Protected Sidney Gibson's Right To Be Free From Double Jeopardy.

Sidney Gibson argues that the government violated his right under the Double Jeopardy Clause of the Fifth Amendment to be free from multiple prosecutions or punishments for the same offense. He maintains that the conspiracy charged in the 2009 indictment was the same conspiracy for which he had been prosecuted and convicted in 2004. He acknowledges that a defendant ordinarily bears the burden of establishing a prima facie case for dismissal of a conspiracy charge based on double jeopardy and that the burden then shifts to the government to prove by a preponderance of the evidence that the defendant was charged with separate conspiracies. But he asserts that he was relieved of his burden to establish a prima facie case because the district court raised the issue sua sponte. Sidney Gibson argues that the district court erred when it instructed the

48

jury that they could convict him for participating in the conspiracy after his conviction in 2004.

Although the district court assured Sidney Gibson's counsel that he had not forfeited an objection about double jeopardy, counsel never objected to the later resolution of the issue by the district court. Counsel failed to object to the jury instructions, and he failed to move for a judgment of acquittal based on double jeopardy. During a preliminary conference, counsel instead approved the proposed jury instructions about double jeopardy by stating, "I've read it and reread it, and I've—I actually like it, Judge. I think it's well written. I think it applies." Although Sidney Gibson likely invited any error made by the district court, see Silvestri, 409 F.3d at 1337, neither party addressed that issue in their briefs or at oral argument. We need not decide whether Sidney Gibson invited any error, because his argument fails even under de novo review.

The district court protected Sidney Gibson from being prosecuted twice for the same offense. Although the indictment charged Sidney Gibson with participation in the conspiracy between 2000 and 2009, the jury instructions ensured that he was not subject to multiple prosecutions or punishments for acts he committed in furtherance of the conspiracy between 2000 and his conviction in 2004. "[D]efects in an indictment can be harmless or can be cured by instructions

49

to the jury." United States v. Martin, 747 F.2d 1404, 1407 (11th Cir. 1984) (citing Ford v. United States, 273 U.S. 593, 602, 47 S. Ct. 531, 534 (1927)). "Further operation of [an] 'old' conspiracy after being charged with that crime becomes a new offense for purposes of [a] double jeopardy claim." United States v. Sturman, 679 F.2d 840, 844 n.9 (11th Cir. 1982) (quoting Stricklin, 591 F.2d at 1121 n.2).

We need not decide the precise point at which further participation in a conspiracy becomes a new crime for purposes of double jeopardy. Cf. United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986). The district court limited Sidney Gibson's liability on the conspiracy charge to those acts performed in furtherance of the conspiracy after his conviction in 2004, and that limitation, without doubt, ensured that he was not twice placed in jeopardy for the same conduct.

Sidney Gibson's reliance on precedents about withdrawal as an affirmative defense to a charge of conspiracy is misplaced. See, e.g., United States v. Arias, 431 F.3d 1327 (11th Cir. 2005); United States v. Starrett, 55 F.3d 1525 (11th Cir. 1995). He points us to no authority requiring a conspirator first to withdraw from and then to rejoin a conspiracy before his renewed participation in that conspiracy can constitute a new crime for purposes of double jeopardy. Sidney Gibson's argument would allow a conspirator, once tried for participation in a conspiracy, to

50

renew his participation in that conspiracy with impunity for the rest of his life so long as he never affirmatively withdraws. The constitutional protection against double jeopardy requires nothing of the sort.

2. The District Court Did Not Abuse Its Discretion When It Admitted Evidence About Sidney Gibson's Prior Conviction.

Sidney Gibson also argues that the district court abused its discretion when it admitted evidence of his arrest in 2003, conviction in 2004, and imprisonment from 2004 through 2008. The district court admitted evidence of Sidney Gibson's prior conviction to prove his knowledge and intent with respect to the possession charge, but Sidney Gibson argues that his knowledge and intent were not at issue because his counsel had stated that he would not deny that his client's fingerprints were on the packages of cocaine nor deny that his client knew what was in the package. He also contends that the evidence was more prejudicial than probative and that the jury would have been especially tempted to use the evidence of his prior conviction as direct evidence of his guilt because the conviction was for the same conspiracy charged in the indictment. He argues that the district court increased the prejudicial impact of the evidence by instructing the jury, "At [the] time [of Sidney Gibson's 2003 arrest,] a vehicle in which he was a passenger was stopped, searched and found to contain one kilogram of cocaine." He argues that

51

this jury instruction relieved the government of its burden of proving his prior conviction beyond a reasonable doubt.  These arguments fail.

At the time of trial, Federal Rule of Evidence 404(b) provided that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but that such evidence "may [] be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b) (2010).  "Evidence, not part of the crime charged but pertaining to the chain of events explaining the context is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime to complete the story of the crime for the jury."  United States v. Wright, 392 F.3d 1269, 1276 (11th Cir. 2004) (alterations omitted).  Federal Rule of Evidence 403 provided that courts may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice."  Fed. R. Evid. 403 (2010).  "Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence."  United States v. Merrill, 513 F.3d 1293, 1301 (11th Cir. 2008).  In doubtful cases, "[t]he balance under Rule 403 should be struck in favor of admissibility."  United States v. Elkins, 885 F.2d

52

775, 784 (11th Cir. 1989).

The district court did not abuse its discretion when it admitted evidence of Sidney Gibson's prior arrest, conviction, and imprisonment. Sidney Gibson's imprisonment was, as the district court ruled, intrinsic evidence relevant to prove his acquaintance with Turral and to explain Sidney Gibson's absence for several years of the conspiracy. See Wright, 392 F.3d at 1276 (explaining that evidence is intrinsic if it is "necessary to complete the story of the crime[] or . . . inextricably intertwined with the evidence regarding the charged offense"). Sidney Gibson's prior conviction in 2004 was relevant to prove his knowledge and intent with respect to the contents of the packages seized from the Avalanche on February 20, 2009. His counsel's disclaimer of an intent to argue that Sidney Gibson did not know the packages contained cocaine was not a stipulation of knowledge. Sidney Gibson's prior arrest in 2003 was relevant to prove James Gibson's participation in the cocaine trafficking activities because James Gibson had rented the car in which Sidney Gibson was transporting cocaine. The district court limited the prejudicial effect of the evidence of Sidney Gibson's prior arrest and conviction by providing contemporaneous limiting instructions and by repeating those limiting instructions during the jury charge. We must assume the jury followed these instructions. United States v. Butler, 102 F.3d 1191, 1196 (11th Cir. 1997).

53

The district court did not plainly err in instructing the jury.  The district court instructed the jury repeatedly that it was the burden of the government to prove beyond a reasonable doubt the facts necessary for the jury to find Sidney Gibson guilty of the charged offenses.  The district court also instructed the jury that it could not consider statements made by the district court other than its instructions on the law when the jury "arriv[ed] at [its] decision concerning the facts."  We conclude that "the jury instructions, taken together, accurately express the law applicable to the case without confusing or prejudicing the jury."  Beasley, 72 F.3d at 1525.

### E.  Leondray Gibson's Arguments About Evidence of Dog Fighting and the Reasonableness of His Sentence Fail.

Leondray Gibson raises two arguments.  First, he argues that the district court abused its discretion when it admitted evidence of his involvement in dog fighting.  Second, he argues that his sentence is unreasonable.  These arguments fail.

### 1.  The District Court Did Not Abuse Its Discretion When It Admitted Testimony About Leondray Gibson's Participation in Dog Fighting.

Leondray Gibson argues that the district court abused its discretion when it admitted testimony about his participation in dog fighting because the probative value of that evidence was substantially outweighed by the danger that it would

unfairly prejudice the jury.  Leondray Gibson contends that the limiting

instructions about this testimony did not diminish its prejudicial impact because

the instructions informed the jury only that Leondray Gibson had not been charged

with dog fighting and that his potential involvement in dog fighting did not

establish his guilt with respect to the offense with which he had been charged.

At the time of trial, Federal Rule of Evidence 403 provided that courts may

exclude relevant evidence "if its probative value is substantially outweighed by the

danger of unfair prejudice."  Fed. R. Evid. 403 (2010).  "Rule 403 is an

extraordinary remedy which should be used only sparingly since it permits the trial

court to exclude concededly probative evidence."  Merrill, 513 F.3d at 1301.  In

doubtful cases, "[t]he balance under Rule 403 should be struck in favor of

admissibility."  Elkins, 885 F.2d at 784.

The district court did not abuse its discretion when it admitted testimony

concerning Leondray Gibson's participation in dog fighting.  The evidence was

probative in that it established that Leondray Gibson earned a substantial income

not attributable to any legitimate source and established how he had become

acquainted with Robert Henry Glanton.  The district court limited the potentially

prejudicial impact of the evidence by disallowing any testimony about the dog

fights or how the dogs were handled or trained and by providing contemporaneous

55

limiting instructions with respect to the challenged testimony.

## 2. Leondray Gibson's Sentence Is Reasonable.

Leondray Gibson also argues that the district court gave significant weight to an improper sentencing factor when it speculated as to the number of lives ruined as a result of his involvement in drug distribution and that, as a result, the district court imposed a substantively unreasonable sentence. Leondray Gibson asserts that the district court admitted that there was no "testimony or evidence of all the lives ruined as a result of the amount of drugs . . . funneled out into the community" through Leondray Gibson's activities. This argument fails.

"A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." Irey, 612 F.3d at 1189. "[T]he party who challenges [a] sentence bears the burden of establishing that the sentence is unreasonable in the light of both [the] record and the factors in section 3553(a)." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005); see also 18 U.S.C. § 3553(a). "In our evaluation of a sentence for reasonableness, we recognize that there is a range of reasonable sentences from which the district court may choose, and when the district court imposes a sentence within the

56

advisory Guidelines range, we ordinarily will expect that choice to be a reasonable one." Talley, 431 F.3d at 788.

Leondray Gibson's sentence is reasonable. Leondray Gibson's adjusted offense level was 44, and the only recommended sentence within the guideline range for that offense level was life imprisonment, U.S.S.G. ch. 5, pt. A, introductory cmt. & n.2 (2011). The district court determined that a life sentence was necessary to avoid sentencing disparities, to promote respect for the law, and to deter Leondray Gibson from committing similar crimes in the future. These are among the factors that section 3553 instructs courts to consider in calculating a sentence, as are "the nature and circumstances of the offense and the history and characteristics of the defendant." See 18 U.S.C. § 3553(a)(1), (2)(A)–(B), (6). And the district court clarified that its statement regarding the number of lives ruined by Leondray Gibson's activities was "in response to [his counsel's] argument" that he was not a violent offender. The district court also explained that Leondray Gibson's "sentence would be the exact same if [the district court] didn't consider anything with regards to lives being destroyed." We are not "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that l[ay]

57

outside the range of reasonable sentences dictated by the facts of the case." Irey, 612 F.3d at 1190.

## IV.  CONCLUSION

We **AFFIRM** the judgment of conviction and sentence of James Gibson.

We **AFFIRM** the judgment of conviction and sentence of Sidney Gibson.  And we **AFFIRM** the judgment of conviction and sentence of Leondray Gibson.

**AFFIRMED.**

KRAVITCH, J., concurring in part and dissenting in part,

I concur in the majority's decision to affirm the convictions and sentences of Sidney and Leondray Gibson. But, because I believe that James Gibson had standing to challenge the search of the vehicle he paid for, controlled the use of, and routinely drove, I respectfully dissent from that portion of the majority's opinion.

The majority opinion, with little factual analysis, concludes that James Gibson was merely a borrower of the Chevy Avalanche and therefore lacked standing to challenge the vehicle's search when Kelvin Burton was stopped while driving it. I believe that this analysis overlooks several critical facts that establish that James Gibson was not merely a borrower, but was rather effectively a co-owner, with a reasonable expectation of privacy in the Avalanche. *See Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (holding that a defendant's expectation of privacy must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society"); *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir. 1984) (requiring that the challenger of a search "demonstrate a significant and current interest in the searched premises in order to establish an expectation of privacy").

59

Although it is true that the Avalanche was titled in Burton's name, Burton conceded that he exercised no control over the truck. He had *no authority* to drive the Avalanche whenever he wanted. Indeed, Burton testified that he "didn't drive the truck." The Avalanche was, according to Burton, "used as a work truck for the [upholstery and detailing] business" that James Gibson owned. As part of his business expenses, James Gibson paid the insurance and maintenance on the Avalanche. And Burton was never a partner in that business or even a part of it in any way.

Rather, the business in which James Gibson and Burton partnered was their drug trade. The two had different roles in this task: Burton registered the Avalanche, while James Gibson maintained it, paid for its insurance, and almost always drove it. Indeed, testimony at the suppression hearing shows that ownership in the instruments of the crime – stash houses and the Avalanche – was a central part of Burton's role in the conspiracy. That Burton shared an ownership interest does not deprive James Gibson of his expectation of privacy in the Avalanche. Based on the totality of the evidence, it is apparent to me that James Gibson controlled use of the Avalanche, usually to the exclusion of Burton, and that he had a reasonable expectation of privacy in the vehicle. *See United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987) ("Whether an individual

60

possesses a constitutionally protected privacy interest depends upon the totality of circumstances." (citing *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980))).

James Gibson's reasonable expectation of privacy in the Avalanche is bolstered by the testimony of government witnesses at the suppression hearing. Drug Enforcement Agency agent Gregory Millard testified that the DEA's suspicion that James Gibson – not Burton – was involved in drug-trafficking was "the purpose for having the tracking device installed on the Chevy Avalanche." Millard personally observed James Gibson driving the Avalanche, and he saw the vehicle "routinely parked in [Gibson's] driveway . . . ."[1]  Agents observed James Gibson driving the Avalanche the day before the stop, and they requested that local police conduct a stop based on the sum of information they obtained about James Gibson from James Gibson's consistent activity in the truck. That is, the

---

[1] The majority says that Agent Millard testified "that the officers found papers in the Avalanche that belonged to Burton, Sidney Gibson, Leondray Gibson, and James Gibson" and posits that this "undermines any argument that James Gibson had exclusive custody and control of the vehicle . . . ." First, as discussed more fully below, James Gibson is not required to show that he had "*exclusive* custody and control" of the Avalanche. Second, the majority's statement glosses over the actual contents of these documents. Of the dozens of documents found in the car, the only documents attributable to Sidney or Leondray Gibson are four money transfer receipts. All the rest are attributable to James Gibson or Kelvin Burton, and the lion's share is attributable exclusively to James Gibson. Thus, the documents in no way undermine our conclusion that James Gibson had the kind of custody and control over the Avalanche sufficient to confer standing on him to challenge the vehicle's search.

61

police's interest in the truck was tied exclusively to their interest in James Gibson – not Burton.

The majority concludes that, despite James Gibson's consistent use of the Avalanche, his payment for its insurance and expenses, and his control over its use, he lacked standing to challenge the vehicle's search. In light of the pragmatism with which we must view expectations of privacy protected by the Fourth Amendment, I cannot agree that these facts are insufficient to confer standing on James Gibson under our precedent. *See United States v. Chaves*, 169 F.3d 687, 691 (11th Cir. 1999) (concluding that a defendant had standing to challenge the search of a warehouse he did not legally own when he "maintained both custody and control of the warehouse," including by having the "ability to exclude others" (internal quotation marks omitted)); *United States v. Sarda-Villa*, 760 F.2d 1232, 1236 (11th Cir. 1985) ("If the appellant does not own or rent the premises searched, . . . he may establish standing by demonstrating an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence." (internal quotation marks omitted)); *Garcia*, 741 F.2d at 365-66 ("[L]egal ownership is not a prerequisite for a legitimate expectation of

62

privacy.").[2] To ignore James Gibson's right to exclude others from the vehicle's use, payment of the vehicle's expenses, and regular possession of the vehicle blinks practical facts and overemphasizes relatively minor legal ones.[3]  *See McKennon*, 814 F.2d at 1543.  It also suggests, incorrectly, that no more than one individual may simultaneously have a reasonable expectation of privacy in an automobile.

Further, the majority concedes that, even as a borrower, James Gibson had standing to challenge the placement of the GPS tracking device.  But then the majority concludes James Gibson cannot challenge the evidence against him directly obtained through exploitation of that unlawful search.  This bait-and-switch contravenes black-letter Fourth Amendment law and renders the Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945, 949 (2012), an empty formality.  *See United States v. Noriega*, 676 F.3d 1252, 1259 (11th Cir. 2012)

---

[2] Although plainly these cases do not involve situations that are factually identical to the facts at issue here, that hardly means they are not persuasive, and, in my opinion, together conclusive that Gibson, a co-owner of the Avalanche, had standing to challenge the search.

[3] The majority seems to confuse a defendant's "control and ability to exclude others," *Chaves*, 169 F.3d at 691, with "exclusive custody and control" and "power to exclude all others." Although the power to exclude all others would certainly be indicative of a reasonable expectation of privacy, this court has never *required* a defendant to demonstrate the latter, as the majority now requires of Gibson.  Testimony in this case shows that Gibson consistently had custody and control over the Avalanche, and was even able to exclude Burton, the legal owner of the car.  I fail to see what more the majority can require of Gibson under our precedent.

63

(emphasizing that the exclusionary rule "bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation" and "'also prohibits the introduction of derivative evidence . . . that is . . . acquired as an indirect result of the unlawful search'" (quoting *Murray v. United States*, 487 U.S. 533, 536-37 (1988))), *cert. denied*, No. 12-7594, 2013 WL 141343 at *1 (Jan. 14, 2013).

The majority's approach not only unnecessarily elevates form over substance, but it also has the potential to create problems for police investigating drug activity. This case provides an apt example: If police sought to secure a warrant for a GPS tracking device, now required by the Supreme Court's ruling in *United States v. Jones*, 132 S. Ct. 945, 949 (2012), under the majority's approach, they would also need to conduct a title search, because who has legal ownership is *the* critical fact for deciding which person has a reasonable expectation of privacy at that time. In this case, that search would have led police to a person different from the one they were investigating – and one about whom police may have no other information. This curveball injects additional uncertainty into the entire investigatory process. If, instead, the focus is on the person who exercises control over the vehicle on an everyday basis, police need not be distracted from closing the net on the suspect they know by having to connect a newly discovered individual they do not know to the criminal activity they were investigating.

64

Because I would hold that James Gibson had standing to challenge the search, I would reverse his convictions and sentence based on *United States v. Jones*, in which the Supreme Court held that placement of a GPS tracking device on a vehicle constitutes a search and therefore that the warrantless placement of that device violates the Fourth Amendment's prohibition on unreasonable searches.  132 S. Ct. at 949.[4]

---

[4] The government, for the first time in a letter citing supplemental authority, argued that the exclusionary rule should not apply because police reasonably relied on binding precedent at the time they placed the GPS tracking device. *See United States v. Davis*, 131 S. Ct. 2419, 2428-29 (2011).  I would conclude that the government abandoned this argument by failing to raise it in its initial brief, even though the Supreme Court had already granted certiorari in *Jones* when that brief was due. *See United States v. Jones*, 131 S. Ct. 3064 (2011) (granting certiorari on June 27, 2011); Red Br. (filed September 14, 2011); *see also United States v. Cunningham*, 161 F.3d 1343, 1344 (11th Cir. 1998) (emphasizing that failure to offer argument on an issue on appeal constitutes abandonment).  Notably, the cases the government cites in support of this proposition were decided before the briefing deadlines in this case; accordingly, they are an improper basis for supplemental authority regardless of their substantive merit. *See, e.g.*, *Davis*, 131 S. Ct. at 2419 (decided June 16, 2011); *see also* Fed. R. App. P. 28(j).