**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11322

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

LAWRENCE ALEXANDER,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:21-cr-60253-KMM-2

_____

_____

No. 23-12282

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

LAWRENCE ALEXANDER,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:21-cr-60253-KMM-2

_____

Before MARCUS and WILSON, Circuit Judges, and JONES,[*] District Judge.

WILSON, Circuit Judge:

Defendant-Appellant Lawrence Alexander is an orthopedic surgeon who was charged with one count of conspiracy to defraud the United States and to pay health care kickbacks, in violation of 18 U.S.C. § 371; and one count of making a false statement relating to health care matters, in violation of 18 U.S.C. § 1035. A jury acquitted Alexander on the conspiracy count but convicted him on the false statement count. He was sentenced to thirty-three months of imprisonment followed by three years of supervised release, and he was ordered to pay $315,704.52 in restitution and to forfeit $125,000.

Alexander raises seven issues on appeal: (1) whether venue was improper; (2) whether the district court erred in denying Alexander's motion to dismiss the indictment under § 1035 for failure

_____

[*] Honorable Steve C. Jones, United States District Judge for the Northern District of Georgia, sitting by designation.

to state an offense; (3) whether the evidence was sufficient to convict Alexander under § 1035; (4) whether the evidence was sufficient to support a theory of aiding and abetting; (5) whether the district court improperly instructed the jury regarding materiality and deliberate ignorance; (6) whether the district court erred in ordering forfeiture; and (7) whether the district court erred in ordering restitution.

We affirm the district court on all issues apart from restitution. On the issue of restitution, we vacate the district court's order and remand for further proceedings consistent with this opinion.

## I.    Background

### a.    Factual History

In 2016, Alexander and co-defendant Jeremy Waxman created a durable medical equipment (DME) company named Silent Hill Bracing and Orthopedic Supplies, LLC (Silent Hill). Waxman was a successful medical supply businessman who owned other DME companies. Waxman approached Alexander, along with a few others, to propose a new DME partnership. Waxman hoped to reduce Medicare scrutiny surrounding the volume of his own DME business. Partnering with Alexander allowed for further distribution of DME products through an entity formally owned by someone other than himself. Like Waxman's other DME companies, Silent Hill purchased doctor's orders for orthopedic braces and then billed Medicare for them.

Waxman and Alexander agreed that Alexander would contribute a substantial financial investment and Waxman would handle the day-to-day operations. Because the listed owner had to provide a personal financial guarantee for the business, Alexander suggested listing the company under his mother, Susan Alexander. According to Waxman, Alexander reasoned that "her credit's already bad anyway." Alexander had other companies under her name, and Silent Hill was the town where she was born. Susan Alexander was the only person identified on Silent Hill's application with Medicare as a DME provider, even though she had no role in the business and was not an owner. Alexander supplied Waxman with the necessary identifying information for his mother, and Waxman would sign Alexander and his mother's name with Alexander's permission.

Alexander and Waxman submitted a CMS 855S form, titled "Medicare Enrollment Application," on January 14, 2019. This form is the basis of the § 1035 false statement count. DME companies like Silent Hill are required to submit 855S forms to Medicare when first enrolling, when recertifying their enrollment every five years, and when making any changes to their Medicare enrollment status. The January 2019 form in question was submitted to notify Medicare that Silent Hill had changed their hours of operations.[1] The form falsely listed Susan Alexander as the business owner and contained a certification of its truth.

---

[1] In 2016, Silent Hill filed an original enrollment CMS 855S form, but that enrollment application is not included in the instant offense.

Silent Hill ceased operations in April 2019 after Medicare suspected fraud.

### b.    Procedural History

In 2021, in a multi-count, multi-defendant indictment, a grand jury indicted Alexander with one count of conspiracy to defraud the United States and pay healthcare kickbacks in violation of 18 U.S.C. § 371 (Count 6), and one count of making a false statement relating to health care matters in violation of 18 U.S.C. § 1035 (Count 19). The indictment also charged co-defendants Waxman, Dean Zusmer, Ronald Davidovic, and Umut Vardar. Only Alexander and Zusmer proceeded to trial.

Before trial, Alexander moved to dismiss the false statement count, arguing that the CMS 855S did not fall within the billing-for-services scope of § 1035. The district court denied the motion, concluding that the form qualified under § 1035 as an enrollment application that initiates enrollment and permits the provider to bill Medicare.

At trial, the government argued that Alexander aided and abetted the submission of an application for Medicare enrollment—the January 2019 form—from which he willfully omitted ownership and management disclosures required by Medicare for enrollment and payment authorization purposes. Alexander moved for a judgment of acquittal three times: at the close of the government's case, at the close of evidence, and in a post-trial motion. The district court denied all three motions.

The jury found Alexander guilty on the false statement count but acquitted him on the conspiracy count. The court sentenced him to thirty-three months of imprisonment to be followed by three years of supervised release. The court ordered Alexander to pay $315,704.52 in restitution and to forfeit $125,000. Alexander timely appealed.

## II.    Venue

Turning to Alexander's arguments, he first challenges whether the Southern District of Florida was the proper venue. We review de novo the district court's venue determination. *United States v. Muench*, 153 F.3d 1298, 1300 (11th Cir. 1998). We must determine "whether, viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility choices in favor of the jury verdict[,] the [g]overnment proved by a preponderance of the evidence that the offense took place within the trial district." *United States v. Burroughs*, 830 F.2d 1574, 1580 (11th Cir. 1987) (citation modified). The government's burden is satisfied when "circumstantial evidence as a whole reasonably supports the inference that the crime was committed in the trial district." *United States v. Bradley*, 644 F.3d 1213, 1253 (11th Cir. 2011) (citation modified).

Alexander argues venue was improper because the government offered no evidence as to who filled in the form, who signed it, who submitted it, who, if anyone, authorized its submission or where the form was sent from. We disagree. There is overwhelming circumstantial evidence reasonably supporting the inference

that the crime took place in the Southern District of Florida. Silent Hill is located in the Southern District of Florida, Alexander and Waxman both lived there at the time, and Waxman's office was there. Evidence also suggests Waxman submitted the CMS 855S form from his office. He testified "[m]y office was filing the applications," and the charged 855S form was "[s]ubmitted by my business on behalf of Silent Hill."

The government has shown by a preponderance of evidence that the offense took place in the Southern District of Florida. Thus, we affirm the district court's determination that venue was proper.

### III.    Motion to Dismiss the Indictment

Next, Alexander challenges whether the district court erred in denying his motion to dismiss Count 19 of the indictment. We "review *de novo* whether an indictment sufficiently alleges an offense" and "review for abuse of discretion a denial of a motion to dismiss an indictment." *United States v. Gbenedio*, 95 F.4th 1319, 1327 (11th Cir. 2024).

Alexander argues that the indictment must be dismissed because it fails to state an offense under § 1035(a)(2). Section 1035(a)(2) criminalizes false statements made in connection with Medicare billing and services submissions. In Alexander's view, the January 2019 form was merely a notice of a change of hours at Silent Hill, and not, as the government argues, a form that could influence Medicare billing or services submissions. Alexander argues that there is no indication that non-billing matters fall within the

scope of § 1035. In response, the government argues that the indictment properly alleged that Alexander and Waxman violated § 1035(a)(2) by submitting a CMS 855S form to Medicare that contained "a materially false, fict[it]ious, and fraudulent statement and entry, in connection with the delivery [of] and payment for health care items and services," by listing Susan Alexander as the sole owner and managing employee of Silent Hill.

An indictment "presents the essential elements of the charged offense," "notifies the accused of the charges to be defended against," and "enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *United States v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009) (per curiam) (citation modified). "An indictment that tracks the language of the relevant statute is sufficient, as long as it also provides a statement of facts and circumstances that give notice of the offense to the accused." *Id.* at 1246 (quotation marks omitted). But an indictment need not "allege in detail the factual proof that will be relied upon to support the charges." *United States v. Sharpe*, 438 F.3d 1257, 1263 n.3 (11th Cir. 2006) (citation modified).

Alexander's indictment is legally sufficient. Count 19 of the indictment directly tracks the language of § 1035(a)(2). The count specifically identified the false statement as his "signing and submitting to Medicare a CMS Form 855S certifying that [Susan Alexander] was the sole owner and managing employee of Silent Hill, when . . . [Susan Alexander] was not the sole owner and managing

employee of Silent Hill." The indictment also included factual allegations that:

> (i) a provider is required to submit a Medicare enrollment application CMS Form 855S to participate in Medicare; (ii) a provider enrollment form requires applicants to disclose individuals or organizations with ownership or partnership interests in a DME supplier; (iii) upon approving an enrollment application, Medicare assigns a provider a "provider number" that enables the provider to submit claims to Medicare for reimbursement.

In total, the indictment described the offense with statutory language and included the facts and circumstances of the charged offense. Thus, the indictment is facially sufficient. We therefore affirm the district court's denial of Alexander's motion to dismiss.

## IV.    Sufficiency of the Evidence

Next, Alexander challenges the district court's denial of his motion for a judgment of acquittal. This court "review[s] de novo a district court's denial of judgment of acquittal on sufficiency of evidence grounds, considering the evidence in the light most favorable to the government, and drawing all reasonable inferences and credibility choices in the government's favor." *United States v. Morley*, 99 F.4th 1328, 1336 (11th Cir. 2024) (citation modified). "A jury's verdict cannot be overturned for insufficient evidence unless there is no reasonable construction of the evidence that could support a guilty verdict." *United States v. Smith*, 22 F.4th 1236, 1242 (11th Cir. 2022). The factfinder "is free to choose among alternative

reasonable interpretations of the evidence, and the government's proof need not exclude every reasonable hypothesis of innocence." *United States v. Tampas*, 493 F.3d 1291, 1298 (11th Cir. 2007) (citation modified).

He argues that the evidence was insufficient for a conviction under § 1035 because the government failed to show that the statement was material to Medicare and failed to support a theory of aiding and abetting the form submission. We address each argument in turn.

### a.    Materiality

Alexander argues that the alleged false statement of his mother's ownership stake cannot support a conviction under § 1035. He asserts that his mother's ownership stake was not material to Medicare because the form was not being used as an application for enrollment. The false ownership information could not have affected the decision to approve or deny enrollment but only whether to approve or deny the new hours. The government argues in response that they need not prove that the decisionmaker—here, Medicare—actually relied on the false statement, just that the statement had the capability of influencing them. And accurate disclosure of ownership interests is important to Medicare in deciding whether to establish or maintain a billing relationship with a DME company like Silent Hill.

A false statement is material if it "has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Kungys v. United*

*States*, 485 U.S. 759, 770, (1988) (quotation marks omitted); *United States v. Henderson*, 893 F.3d 1338, 1346 (11th Cir. 2018). A statement is material based on the determination of two questions: "what statement was made?" and "what decision was the agency trying to make?" *United States v. Gaudin*, 515 U.S. 506, 512 (1995). The government need not "show that the decisionmaker actually relied on the false statement." *Henderson*, 893 F.3d at 1346 (citing *United States v. Clay*, 832 F.3d 1259, 1309 (11th Cir. 2016) ("[T]he test is not whether the agents were actually misled.")). A false statement can be material even "if the decision maker actually knew or should have known that the statement was false." *Id.* (quotation marks omitted).

Section 1035 applies to false statements relating to health care matters:

> (**a**) Whoever, in any matter involving a health care benefit program, knowingly and willfully–
>
> . . .
>
> (**2**) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both.

The government presented sufficient evidence at trial to support their position that the false statement was material to Medicare. Expert witness Steven Quindoza testified that Medicare enrollment was an ongoing conversation beyond the initial enrollment form, and that the text of the CMS 855S form explicitly states the importance of that ownership information.[2] Quindoza also explained that submission of false ownership information would lead to enrollment termination.[3] According to his testimony, this risk of termination is ongoing with every CMS 855S submission. Therefore, even though the form was not used for enrollment, the false ownership information was capable of influencing the decisionmaker. This meets the standard of materiality. *Henderson*, 893 F.3d at 1347 (finding evidence that the false statement *could* have

---

[2] The 855S form makes the significance of ownership information explicit, stating that to "obtain and retain their billing privileges," DME companies are required to, among other things, "disclose any person having ownership, financial or control interest in the supplier." The form also made clear that "deliberately furnishing false information" could expose someone to criminal penalties under § 1035.

[3] Quindoza testified that failure to disclose an owner could lead to several consequences: "First, the enrollment status of that provider could be revoked, which means they could no longer submit claims; secondly, for claims that were already paid, Medicare can demand payment, repayment of such claims or demand an over payment of such claims. And then lastly, Medicare can consider referring that provider to a law enforcement agency for potential investigation and potential prosecution."

misled a medical professional sufficient to support a theory of materiality). Despite Alexander's efforts, the jury was convinced by the government's argument of materiality.[4]

Drawing all inferences in the government's favor, we find that a reasonable construction of the evidence supports the jury's verdict.

### b.    Aiding and Abetting

Next, Alexander argues that the evidence was insufficient to convict him under a theory of aiding and abetting. "To prevail under a theory of aiding and abetting, the government must prove: (1) the substantive offense was committed by someone; (2) the defendant committed an act which contributed to and furthered the offense; and (3) the defendant intended to aid in its commission." *United States v. Margarita Garcia*, 906 F.3d 1255, 1280 (11th Cir. 2018) (internal quotation marks omitted). "Aiding and abetting need not be specifically alleged in the indictment; assuming the evidence supports it, the accused can be convicted of aiding and abetting so long as the jury is instructed on it." *United States v. Seabrooks*, 839 F.3d 1326, 1333 (11th Cir. 2016) (citation modified). "[The] intent requirement [is] satisfied when a person actively participates

---

[4] Alexander's argument that the false statement was not material because it was not required by Medicare also fails. Liability under § 1035 does not depend on whether a statement was required, but whether the defendant knowingly and willfully submitted the false statement and that statement was material. Here, § 1035 liability attaches even though the statement was voluntarily inserted in the CMS 855S form.

in a criminal venture with full knowledge of the circumstances constituting the charged offense." *Rosemond v. United States*, 572 U.S. 65, 77 (2014). "The government can prove knowledge or intent through circumstantial evidence." *United States v. Beaufils*, 160 F.4th 1147, 1163 (11th Cir. 2025).

Alexander argues that the government failed to establish that he had any knowledge of the criminal objective attributed to Waxman. When Waxman testified, he did not recall the January 2019 form and only testified about the routine process of submitting forms on behalf of Silent Hill. He did not testify to the nature, preparation, or submission of either the form or the false statement.

We disagree. The government presented specific evidence at trial that meets the three-prong *Margarita Garcia* test. First, the form was submitted by Silent Hill under the day-to-day supervision of Waxman. Second, it was Alexander's idea to use his mother as the false owner on the original Medicare forms. Alexander obtained and provided his mother's fingerprints, Social Security number, personal information, and signature. This evidence shows that Alexander contributed to and furthered the false statement submission. Third, Waxman testified that the January 2019 form was submitted by Silent Hill, and as a matter of course, Alexander would have seen and consented to each of the CMS 855S forms before submission. Waxman also testified that he never signed a document on Alexander's mother's behalf without Alexander's permission. Because this form includes her signature, it is reasonable to

conclude that Alexander consented to its submission in the regular course of business.

After a nine-day jury trial, the jury determined that Alexander aided and abetted the signing and submission of the January 2019 form. We find that a reasonable construction of the evidence meets the three-prong test in *Margarita Garcia* and supports the jury's verdict. Thus, we affirm the district court's denial of the motion for a judgment of acquittal on both sufficiency of evidence grounds.

## V.    Jury Instructions

Next, Alexander challenges whether the district court erred in overruling his objection to the materiality jury instruction and the deliberate ignorance jury instruction. We review de novo the legal correctness of jury instructions, but we review the district court's phrasing for abuse of discretion. *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000).

We review jury instructions "to determine whether the instructions misstated the law or misled the jury to the prejudice of the objecting party." *United States v. Gibson*, 708 F.3d 1256, 1275 (11th Cir. 2013) (quotation marks omitted). We will not reverse a conviction based on a jury instructions challenge "unless we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Id*. (quotation marks omitted). When a party expressly accepts a jury instruction, "such action constitutes invited error" and "serve[s] to waive [his] right

to challenge the accepted instruction on appeal." *United States v. Silvestri*, 409 F.3d 1311, 1337 (11th Cir. 2005).

### a.    Materiality

First, Alexander challenges the materiality instruction given to the jury. He argues that the error in instruction rendered his trial "fundamentally unfair" because it permitted the jury to convict Alexander on an invalid theory of materiality.

To begin, we review the proposed and final jury instructions. At trial, Alexander and the government each proposed jury instructions regarding the materiality element of § 1035. The government's final version proposed:

> A "material" fact is an important fact – not some unimportant or trivial detail – that has a natural tendency to influence or is capable of influencing a decision of a department or agency in reaching a required decision.

Alexander's definition of materiality was identical, and included an additional instruction describing the relevant decision in the case:

> In this case, the alleged false statement relates to a form 855S filed by Medicare provider applicants. To be material as to such a form, the false statement must have a natural tendency to influence or be capable of influencing the decision to approve or deny the request to participate or enroll as a provider of services or supplier under a Federal health care program.

At the charge conference, Alexander's counsel asked the court to give the alternative instructions he submitted, arguing that the court's proposed instruction was "inconsistent with the evidence." The court considered the objection and denied it. And yet, the court's final version of the materiality instruction incorporated Alexander's submission almost exactly:

> A "material" fact is an important fact – not some unimportant or trivial detail – that has a natural tendency to influence or is capable of influencing a decision of a department or agency in reaching a required decision.

> In this case, the alleged false statement relates to a form 855S filed by Medicare provider applicants. To be material as to such a form, the false statement must have a natural tendency to influence or be capable of influencing the decision to approve or deny the request to participate or enroll as a provider of services or supplier under a Federal health care program.

The one and only difference between Alexander's proposed instructions and the final court instructions is a line break splitting the instruction into two paragraphs. The language and the substance of the instruction are identical.

Alexander proposed the very instruction that he now challenges on appeal. "This is a textbook case of invited error." *United States v. Maradiaga*, 987 F.3d 1315, 1322 (11th Cir. 2021). We therefore decline to review his challenge to the jury instruction on materiality.

b.        *Deliberate Ignorance*

Next, Alexander argues that the district court erred in granting the government's request for a deliberate ignorance instruction.

In a footnote in his initial brief, Alexander adopts the summary of the arguments of his co-defendant Zusmer "to the extent [he] . . . is similarly situated in regard to those claims of error."[5] There is no other mention in Alexander's initial brief regarding his argument against the deliberate ignorance instruction. The first time he makes the argument properly is in his reply brief, and so he waives the argument altogether.[6] *See Big Top Koolers, Inc. v. Circus-Man Snacks, Inc.*, 528 F.3d 839, 844 (11th Cir. 2008) ("We decline

---

[5] Zusmer's objection to the jury instruction focused on the government's extensive evidence of his actual knowledge and involvement in the conspiracy, which was at odds with the deliberate ignorance instruction. But this does not apply to Alexander, who claims the opposite, to have been uninvolved in any of the filing or day-to-day business. Because Zusmer's argument does not apply, the adoption fails.

[6] Even if we did address it, the argument still fails. The deliberate ignorance instructions used by the court were identical to the Eleventh Circuit Pattern Instructions. The defense did not propose any alternative instructions. At the charge conference, Alexander's counsel objected to the use of deliberate ignorance instructions because there was "no evidence of [Alexander's] conscious avoidance." The district court concluded that this issue would be "a question of fact for the jury" and overruled Alexander's objection. There is no evidence that the district court misstated the law or misled the jury. *See Gibson*, 708 F.3d at 1275. And there is significant evidence put forth at trial to support a deliberate ignorance theory—that Waxman handled the day-to-day operations of the business and gave Alexander periodic updates and profit disbursements.

to address an argument advanced by an appellant for the first time in a reply brief.").

Accordingly, we affirm the district court's jury instructions.

## VI.    Forfeiture

Alexander challenges the forfeiture order issued by the district court. We review the factual findings of a forfeiture judgment for clear error and questions of law de novo. *United States v. Esformes*, 60 F.4th 621, 631–32 (11th Cir. 2023). District courts shall order forfeiture of property "that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of" a federal healthcare offense. 18 U.S.C. § 982(a)(7). Courts must make forfeiture-related findings under § 982(a) by a preponderance of the evidence. *United States v. Hasson*, 333 F.3d 1264, 1278–79 (11th Cir. 2003).

Under the Federal Rule of Criminal Procedure 32.2, courts must follow three steps in criminal forfeiture proceedings. First, a judgment of forfeiture may not be entered unless the defendant receives notice of forfeiture in the indictment or information; second, a court must determine the amount of money a defendant will be ordered to pay (if a money judgment will be entered) as soon as practical after a guilty verdict; and third, a court must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, which it must do before sentencing unless doing so is impractical. *United States v. Farias*, 836 F.3d 1315, 1329 (11th Cir. 2016). "The failure to enter a preliminary [forfeiture] order does not bar a judge from ordering forfeiture at sentencing subject

to harmless-error principles on appellate review." *McIntosh v. United States*, 601 U.S. 330, 333 (2024).

First, Alexander argues that his rights were violated when the district court permitted the government to move forward with a new forfeiture claim that was introduced post-sentencing. Before we dive into Alexander's argument, we will detail the timeline of the proceedings in the district court.

The government first moved for a preliminary order of forfeiture on April 19, 2023, the day before the sentencing hearing. The government calculated that the total value of gross proceeds obtained by Alexander traceable to his offense of conviction was $125,000. At sentencing, Alexander's counsel asked to postpone the restitution and forfeiture determinations until after sentencing because the government's motion violated the timing requirement of Federal Rule of Criminal Procedure 32.2(b)(2)(B). Additionally, Alexander's counsel took issue with the government's lack of evidence supporting the $125,000 calculation. The district court postponed the issue of forfeiture and restitution for later resolution to give the defense a chance to respond to the government's motion.

On May 3, 2023, Alexander responded in opposition to the government's motion. Alexander "contest[ed] the government's forfeiture motion on multiple grounds, including factual, procedural, and estoppel grounds." Alexander requested that the court deny the forfeiture motion as untimely.

Eventually, the forfeiture and restitution hearing was held on June 27, 2023. The government proposed a forfeiture order of

$125,000, based on the record at trial and Waxman's testimony. Waxman testified that when Silent Hill shut down, he withdrew most of the money from the business bank account and split it between himself and Alexander. The bank account reflected two withdrawals for a total of $345,000, making $125,000 a conservative estimate of what Alexander would have received. Alexander's counsel objected to this estimation, arguing that "the Government cannot after sentencing come up with a new basis for asserting forfeiture . . . than it claimed in the pre-sentencing motion." Alexander repeated his initial argument that the government's claim failed to properly trace the money back to his bank accounts. At the conclusion of the arguments, the district court entered a forfeiture order for $125,000.

The district court erred by failing to enter a preliminary order of forfeiture in advance of sentencing. *Farias*, 836 F.3d at 1330. But "[n]oncompliance with Rule 32.2(b)(2)(B)'s timing requirement is a procedural error subject to harmlessness review." *McIntosh*, 601 U.S. at 344. Here, the procedural error was harmless. The record establishes that Alexander had fair notice prior to the forfeiture hearing that the government would seek forfeiture. Alexander was informed at the time of the indictment, prior to sentencing, at sentencing, and prior to the forfeiture hearing. Not only did Alexander have fair notice, but the district court postponed the hearing for the sole purpose of giving Alexander time to properly respond. Alexander explicitly agreed with this approach at the sentencing hearing and proceeded to file a response less than a month later.

Additionally, Alexander had specific notice of the forfeiture amount. Waxman testified at trial that he made two withdrawals amounting to $345,000, split between himself and Alexander. The final amount of $125,000 was the same amount the government calculated in their first motion for forfeiture. And Alexander was given a full opportunity to contest this amount at the hearing. He has failed to show "prejudice sufficient to void the forfeiture order." *McIntosh*, 601 U.S. at 345. We can confidently say that the procedural error was harmless.

Second, Alexander argues that the government's theory is speculative and does not meet the burden of traceability under 18 U.S.C. § 982(a)(7). We are unpersuaded. The trial judge explained at the forfeiture hearing that he "heard the testimony of Mr. Waxman" and is "satisfied that the evidence supports the fact that those amounts were fairly traceable." This meets the preponderance of the evidence standard. *See Hasson*, 333 F.3d at 1278–79.

Alexander had ample notice of the type and scope of forfeiture sought, and the government has shown by a preponderance of the evidence that the amount is traceable to the offense. Accordingly, we affirm.

## VII.    Restitution

Lastly, Alexander challenges the restitution order. He argues that the district court erred when it entered a restitution order against him because the government failed to show that the false statement caused actual loss. The government responds that his

false statement offense caused losses on all claims submitted by Silent Hill after the January 2019 form. Like forfeiture, we review the restitution award's "factual findings for clear error and questions of law *de novo.*" *Esformes*, 60 F.4th at 631–32.

The Mandatory Victims Restitution Act (MVRA) requires district courts to order defendants to pay restitution to victims of certain offenses, "including any offense committed by fraud or deceit." 18 U.S.C. § 3663A. The Act defines a victim as "a person directly and proximately harmed as a result of the commission of" such an offense. 18 U.S.C. § 3663A(a)(2). It directs district courts to resolve any disputes over the proper amount of restitution by a preponderance of the evidence. 18 U.S.C. § 3664(e).

"The purpose of restitution is not to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." *United States v. Martin*, 803 F.3d 581, 594 (11th Cir. 2015) (citation modified). For that reason, "[r]estitution is not designed to punish the defendant." *Id.* at 595. To accomplish restitution's purpose, a court must base the amount of restitution awarded to the victim on the amount of loss that the defendant's conduct "actually caused." *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010) (citation modified). "That means that, in a restitution order, the court must account for any value that a defendant's scheme bestowed on the victim." *United States v. Young*, 108 F.4th 1307, 1319–20 (11th Cir. 2024). Under the MVRA, sentencing courts must order restitution for a victim's "actual loss directly and proximately caused by the defendant's offense

of conviction." *United States v. Collins*, 854 F.3d 1324, 1336 (11th Cir. 2017) (citation modified).

Recently, we've said in relation to restitution for a scheme to defraud the Federal Employee's Compensation Act healthcare program:

> As we've noted, in fraud cases, a conviction inherently means that the paying victim experienced at least some loss. So if the defendant is convicted, that means the government has already shown loss. For that reason, it makes sense for the restitution amount to initially include the entire amount the victim entities paid related to the fraudulent scheme, and then for the defendant to be able to offset that amount by the value of any goods or services she can prove were medically necessary.

*Young*, 108 F.4th at 1322 (vacating a restitution award where the record did not show whether the calculated loss was due to medically necessary prescriptions).

Here, the district court ordered Alexander to pay $315,704.52 in restitution—the amount reflecting payments made by Medicare to Silent Hill for claims submitted after the January 2019 form. We review this factual finding for clear error. *See United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007). Alexander does not dispute the amount of restitution owed, but that restitution is owed at all. He argues that the evidence at trial does not show that the January 2019 form was ever processed by Medicare,

much less relied upon. And without evidence of actual reliance, he argues that restitution is unwarranted.

We agree. Restitution is not simply used as punishment, and as such, there needs to be a showing of specific losses that the victim would not have otherwise incurred. For example, in *Young*, a doctor challenged a restitution award after he was convicted of participating in a kickback scheme. 108 F.4th at 1323. We determined that it was not enough that he participated in the general fraud scheme; the government had to show by a preponderance of the evidence that each kickback he received was fraudulent. *Id*.

The government suggests that because the jury found the false statement to be material to Medicare's decision to continue Silent Hill's enrollment, every service billed after the false statement was submitted is a target of the restitution award. Essentially, that the false statement caused Medicare under false pretenses to pay money it would not otherwise have. The district court relied in part on *Collins* in calculating the restitution award. But the defendant in *Collins* was convicted of a conspiracy, 854 F.3d at 1329, unlike here, where Alexander was acquitted of the larger conspiracy. *See Hughey v. United States*, 495 U.S. 411, 418 (1990) (holding that restitution orders should not expand beyond the scope of the convicted offense). And as the government conceded at the restitution hearing, there is no Eleventh Circuit case that addresses restitution for a § 1035 conviction alone.

In the absence of a conspiracy conviction, we must instead determine what actual losses Medicare suffered because of the singular false statement made in January 2019. "Our deference to the district court is not unlimited, and we will hold a finding of fact clearly erroneous if the record lacks substantial evidence to support it." *Robertson*, 493 F.3d at 1335 (citation modified). Here, there is insufficient evidence to support the district court's factual finding.[7]

Even accepting *Young*'s presumption that a fraud conviction "inherently means that the paying victim experienced at least some loss," the record does not show that the government specifically relied on Alexander's false statement. 108 F.4th at 1322. Prior to the restitution hearing the parties submitted joint stipulations, two of which are relevant here. First, that "the government has not produced to date a letter of receipt or a letter of processing by the Medicare contractor for the January 2019 855S form for Silent Hill."[8]

---

[7] We pause to note that the government's burden for restitution differs from that of the underlying § 1035 conviction. To be convicted of making a false statement, the government need not prove that the statement was ever relied upon, but just that it was capable of influencing the decisionmaker. *See Henderson*, 893 F.3d at 1346. The standard for restitution is different. Here, the false statement must have actually and proximately caused the loss. At the restitution hearing, the district court appears to confuse these two standards. The court treated Alexander's reliance argument as one "the jury [already] rejected." But the jury was not asked to determine reliance at trial—they were asked only whether the false statement was capable of influence. The evidence to support a § 1035 conviction is not necessarily sufficient to support an order of restitution.

[8] Alexander concedes that the form was eventually found in Medicare's files and presented at litigation. But reception of the document alone does not

Second, that "the government did not offer evidence at trial as to when the referenced changed enrollment information was reviewed by the Medicare contractor." Instead, the government argued that Medicare *likely* would not have allowed Silent Hill to retain its billing privileges and *may* have even reversed past claims. But the chance of reliance is not equivalent to reliance itself.

Despite this evidentiary shortcoming, the district court was satisfied that because Alexander was convicted of the submitting a false statement, "the natural consequence of" that conviction was that Silent Hill obtained payments from Medicare. We disagree. We find that there is insufficient evidence to support this finding because nothing in the record suggests that the Medicare provider ever reviewed or acted on the January 2019 form. *See United States v. Stein*, 846 F.3d 1135, 1156 (11th Cir. 2017) (holding that the government must establish by a preponderance of the evidence that the victims relied on the fraudulent information).[9] Without any causal link between the January 2019 form and the later claims, the government has failed to show the amount of loss that Alexander's conduct actually caused. Thus, the district court's factual finding is clearly erroneous.

Accordingly, we vacate the restitution award.

---

prove reliance. And speculation that Medicare might have relied upon the document is not enough to meet the government's burden.

[9] The district court also failed to account for any value that the submitted claims may have bestowed upon Medicare, as required. *Young*, 108 F.4th at 1319–20.

## VIII.  Conclusion

We affirm the judgment of the district court, but we vacate the restitution order and remand for proceedings consistent with this opinion.

**AFFIRMED IN PART, AND VACATED IN PART AND REMANDED.**